**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES FRAZIER,** | : | **Case  No. 3:09-CV-1208** |
| | : | |
| **Petitioner,** | : | |
| | : | **JUDGE PATRICIA A. GAUGHAN** |
| **vs.** | : | |
| | : | |
| **DAVID BOBBY, Warden,** | : | **MEMORANDUM OF OPINION** |
| | : | **AND ORDER** |
| **Respondent.** | : | |

This matter is before the Court upon Petitioner James Frazier's ("Frazier" or "Petitioner") Petition for Writ of Habeas Corpus and Request for Oral Argument.

Petitioner, acting pursuant to 28 U.S.C. § 2254, filed a Petition for Writ of Habeas Corpus, challenging his conviction and sentence of death rendered by an Ohio court. (ECF No. 13-1.)  The Respondent, David Bobby, Warden ("Respondent"), filed a timely Return of Writ, and Frazier filed a Traverse.  (ECF Nos. 19 and 24, respectively.)  Respondent then filed a Sur-Reply to Traverse and Opposition to Evidentiary Hearing.  (ECF No. 25.)  Petitioner later filed a Request for Oral Argument and Motion to Supplement Authority for First and Second Claims for Relief.  (ECF Nos. 28 and 29, respectively.)  Respondent opposed both these motions.  (ECF No. 30.)

For the following reasons, the Petition for Writ of Habeas Corpus and Request for Oral Argument are denied.

I.       **Factual History**

On March 9, 2004, a Lucas County Grand Jury issued a three-count indictment against

Frazier.  The indictment charged Frazier with the aggravated murder of Mary Stevenson in

violation of Ohio Revised Code § 2903.01, aggravated robbery in violation of Ohio Revised

Code § 2911.01, and aggravated burglary in violation of Ohio Revised Code § 2911.11.  The

aggravated murder charge carried two death penalty specifications for murder while committing,

attempting to commit, or fleeing after committing aggravated robbery and aggravated burglary in

violation of Ohio Revised Code § 2929.04(A)(7).  Frazier entered a plea of not guilty to all

charges.

The Ohio Supreme Court set out the following factual history, as adduced by the evidence

presented at trial, upon considering Frazier's direct appeal of his convictions and sentence:

> The evidence at trial established that, on the morning of March 2, 2004, James
> Frazier entered 49-year-old Mary Stevenson's apartment and murdered her by
> strangling her and slitting her throat. Frazier stole two of her purses and fled the
> scene. Subsequently, Frazier was convicted of the aggravated murder of
> Stevenson and was sentenced to death.

* * *

> The evidence at trial established the following facts. Frazier and Stevenson were
> both residents of the Northgate Apartments in Toledo. Northgate is a federally
> subsidized apartment complex, and the residents are low income and either elderly
> or disabled. Frazier was supported by Social Security disability income, and
> Stevenson suffered from cerebral palsy.

> During the late summer or early fall of 2003, Frazier baked a cake for Stevenson.
> Later, Stevenson took the cake pan to Cindy Myers, a social worker at Northgate
> Apartments, and asked Myers to return the pan to Frazier. Stevenson asked Myers
> to "tell him thanks for baking the cake but she could do that herself, and * * * she
> also had a boyfriend." Myers returned the cake pan to Frazier and told him, "Mary
> said thank you for baking the cake but she can bake herself * * * and not to do it
> anymore." Frazier responded, "[O]kay."

On the evening of March 1 and in the early morning of March 2, 2004, Frazier and a group of individuals smoked crack cocaine and drank alcohol inside Frazier's third-floor apartment.

During the drug party, Frazier provided Chastity McMillen with $200 to $300 worth of crack cocaine without charge. At some point, Frazier's guests ran out of crack. Frazier called someone to deliver more crack, and he also called someone for money to buy it. More crack was brought to Frazier's apartment later that night.

Frazier was wearing jeans and a white T-shirt during the party. At some point during the evening, Frazier left the party. When he returned, Frazier was not wearing a shirt.

At 7:17 a.m. on March 2, Frazier made a 911 call to report a woman at the complex lying on the laundry-room floor, having seizures. Paramedics met Frazier at the apartment, but no one needing medical attention was found in the laundry room.

Stevenson lived alone in a first-floor apartment at Northgate. She supported herself on Social Security benefits. Because of her condition, Stevenson had limited mobility and difficulty speaking. Her apartment was located about 20 to 30 feet from the laundry room and 15 feet from the elevators close to one of the stairways.

On March 1, Bill Gangway, Stevenson's boyfriend, and Stevenson talked on the telephone, and they agreed to meet at her apartment the next day. Around 9:00 a.m. on March 2, Gangway knocked on Stevenson's apartment door, but she did not answer. Gangway remained at Northgate for the rest of the day and unsuccessfully tried to contact Stevenson three or four times. At 4:15 p.m., Susan Adams, Northgate's assistant manager, checked on Stevenson. After receiving no answer to her knocking, Adams entered Stevenson's apartment and found her lying on the bedroom floor, dead. Adams then called 911.

Around 5:00 p.m. on March 2, police arrived at Stevenson's apartment. Stevenson's body was near the foot of her bed. Stevenson's throat had been slashed, and blood had pooled underneath her head and shoulders. She was wearing a nightgown that was tucked into the front of her underpants.

Police examining Stevenson's apartment found no signs of a struggle, forcible entry, or indication that her apartment had been ransacked. Stevenson's purse and identification cards were missing, and police found no cash in her apartment. Stevenson's apartment key was discovered on her wheelchair in the living room. No knife or other possible murder weapon was found in Stevenson's apartment.

However, a knife was missing from the knife holder on the kitchen counter.

Police used an alternate light source to look for semen or other bodily fluids in Stevenson's bedroom, but police found no evidence of semen on Stevenson's bed, bed sheets, robe, or anything else in the bedroom. Police also searched the area around the apartment building and the dumpster that was used by first-floor residents, but no evidence was found.

On March 3, 2004, police investigators examined the sealed trash compactor-dumpster that was used by Northgate residents living on the second through the tenth floors. During the search, investigators found Stevenson's clutch purse, which contained her birth certificate, bank card, and library card. Two bills addressed to Frazier were located near the clutch purse. Investigators also found Stevenson's Social Security and Medicaid cards, her large black purse, and a Fruit of the Loom T-shirt, size double X, 50 to 52, that had been turned inside out. Frazier is six feet one inch tall and weighs 250 pounds. A knife that matched the set of knives in Stevenson' kitchen was also found and appeared to have blood on it. No money was found in Stevenson's two purses.

Investigators returned to the police station with the evidence collected from the trash. Bloodstains were detected on the front of the white T-shirt and tested positive for the presence of human blood. The T-shirt and the knife were sent to the lab for DNA testing.

On March 4, 2004, investigators executed a search warrant of Frazier's apartment. There, police seized two T-shirts that were the same size and had the same manufacturing tags as the T-shirt found in the trash compactor.

At approximately 2:30 p.m. on March 4, Toledo detectives William Seymour and Denise Knight conducted a videotaped interview of Frazier. After being advised of his *Miranda* rights and waiving them, Frazier stated that sometime after 6:00 a.m. on March 2, he went to the laundry room with a basket of bedding and found a woman lying on the laundry-room floor. According to Frazier, he knocked on Stevenson's door and said he needed to call 911. Stevenson let Frazier into her apartment. Frazier then called 911 and told the operator that there was a lady lying on the laundry-room floor at Northgate Apartments. Frazier left Stevenson's apartment and waited for the paramedics.

Frazier said Stevenson was fine when he left her apartment. Stevenson locked the door when he left. Frazier said he did not return to Stevenson's apartment after making the 911 call.

Frazier said the lady was gone when he returned to the laundry room. He told the arriving paramedics that he did not know what happened to the lady. Frazier says

4

he asked Francis Clinton, a fifth-floor resident who was in the laundry-room area, about the lady, and she said, "I didn't see nobody."

At approximately 9:45 p.m. on March 4, 2004, Detectives Seymour and Knight conducted a second videotaped interview of Frazier. According to Frazier, he watched TV at a friend's apartment until midnight or 1:00 a.m. on March 2. Frazier then returned to his apartment. Sometime after 6:00 a.m., he took a light load of bedding to the laundry room. He repeated that he found an unidentified lady lying on the laundry-room floor, went to Stevenson's apartment, and called 911.

Frazier said, "Nothing happened out of the ordinary" when he was in Stevenson's apartment. Frazier said that Stevenson had a beautiful personality but claimed, "I never looked at her in a sexual way." He claimed that he was impotent, so he had no interest in sex. Frazier denied throwing away anything that belonged to the victim. However, he admitted, "I threw that T-shirt away." Frazier said, "I did not do this."

Surveillance cameras at Northgate Apartments provided coverage of the elevators, the main entrances, and the parking lots. However, there were no cameras in the main stairwell next to the laundry room. Police reviewed the surveillance tapes and tracked the movements of Frazier and other residents on the evening of March 1 and the morning of March 2.

Cameras show Francis Clinton entering the laundry room with a load of clothes at 6:30 a.m. on March 2 and then departing. At 7:16 a.m., Frazier entered the laundry room with a small bundle of clothes under his arm and then left and walked towards Stevenson's apartment.

At 7:19 a.m., Clinton returned to the laundry room. At 7:24:11 a.m., Frazier came back to the laundry room with the bundle of clothes under his arms, took a quick look inside, and walked away. At 7:25:02 a.m., Frazier took the elevator to the third floor with the bundle still under his arms. At 7:25:25 a.m., Frazier got out on the third floor. He returned to the elevator at 7:25:50 a.m. without the bundle.

At 7:25:58 a.m., Clinton left the laundry room and returned to the fifth floor. At 7:26:12 a.m., Frazier returned to the laundry room, took another quick peek inside, and left. At 7:26:44 a.m., Frazier and the paramedics entered the laundry room. At 7:27:14 a.m., they departed. Frazier wore a white T-shirt during this entire sequence of events.

At trial, Detective Seymour testified that the third-floor garbage chute is close to the elevator. He said it takes approximately 20 seconds to walk at a normal pace to the garbage chute and return to the elevator. Frazier's third-floor apartment is

5

further down the hall. Seymour said that walking at a regular pace to Frazier's apartment and returning to the elevator takes 40 to 45 seconds.

Dr. Cynthia Beisser, the deputy coroner for Lucas County, conducted the autopsy on Stevenson. The victim suffered a "large sharp-force injury across the neck" that cut "both the carotid arteries and the jugular veins and went through the trachea * * * down to the spine." Stevenson's thyroid cartilage was fractured, and "there was bruising on the undersurface of the chin and on the upper portion of the chest, and * * * blood in the tongue," which showed that she had also been strangled. Dr. Beisser also found vaginal abrasions and lacerations consistent with vaginal intercourse that had occurred while the victim was alive. Dr. Beisser concluded that Stevenson "died of a combination of * * * strangulation and the sharp-force injury to the neck."

Detective Terry Cousino collected physical evidence during the autopsy, including a hair found on Stevenson's right tricep. The hair was sent to the lab for further testing.

Staci Violi, a serology expert at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), conducted tests and verified the presence of human blood on the knife blade and on some areas of the T-shirt that had been found in the trash compactor. Test results were also positive for the presence of amylase, a component of saliva, on the neck area of the T-shirt. However, vaginal and rectal swabs obtained during the autopsy tested negative for the presence of semen.

Brian Bowen, a DNA analyst at BCI, conducted DNA tests on bloodstains found on the knife blade. These tests revealed a partial DNA profile consistent with Stevenson's DNA. Bowen testified that the expected frequency of occurrence of the partial DNA profile found on the knife blade is one in 58,070,000 individuals. DNA testing of the knife handle revealed a "mixture," with the "major DNA type * * * consistent with Mary Stevenson." Bowen also conducted DNA testing of a bloodstain from the T-shirt. These tests provided a full DNA profile consistent with Stevenson's DNA. The expected frequency of occurrence from the DNA on this bloodstain is one in 285,500,000,000,000 individuals.

Bowen also conducted DNA testing on the amylase stain on the T-shirt. DNA testing resulted in a "partial profile [that] was a mixture, and the major DNA type is consistent with James Frazier." The frequency of occurrence of the DNA from this stain is one in 493 individuals. DNA testing of the neck band of the T-shirt resulted in a mixture, and Frazier's DNA is consistent with the DNA of a contributor to the mixture. Bowen testified that the frequency of occurrence of the DNA from the neck band of the T-shirt is one in 15,500 individuals. However, Bowen's written report states that the expected frequency of occurrence is one in 115,500 individuals. Finally, DNA testing of swabs from the armpit of the T-shirt

6

resulted in a "mixture," and Frazier's DNA is consistent with the DNA of a contributor to that mixture.

Ted Manasian, an expert in trace evidence at BCI, examined the hair found on Stevenson's right tricep. Manasian testified, "It was found also to be similar * * * to gross physical characteristics to the pubic hairs of James Frazier." Subsequently, the hair was sent to the ReliaGene Corporation for further testing.

Amrita Lal-Paterson, formerly a senior DNA analyst at ReliaGene Technologies, conducted mitochondrial DNA testing of the hair from Stevenson's arm. Lal-Paterson found that the hair sample is "consistent with the * * * mitochondrial genetic profile of Mr. Frazier, and * * * therefore Mr. Frazier or a maternal relative of his could not be excluded from that particular sample." According to Lal-Paterson, the percentage of people that could be excluded as a potential donor is 99.6 percent of the African-American population, 99.8 percent of the Caucasian population, and 99.6 percent of the Hispanic population.

Lal-Paterson also conducted Y-chromosome testing of swabs from the T-shirt's armpit. The result of this testing was a "mixture," and the "major contributor was consistent with Mr. Frazier or a paternal relative of his." Lal-Paterson testified that the percentage of the population that could be excluded as a potential donor is 99.8 percent of the African-American population, 99.7 percent of the Caucasian population, and 99.3 percent of the Hispanic population.

The defense presented no evidence during the trial phase.

*State v. Frazier*, 115 Ohio St. 3d 139, 140-45, 873 N.E.2d 1263, 1273-77 (Ohio 2007).

## II.    Procedural History

Frazier's trial commenced on May 10, 2005.  A jury returned a verdict of guilty as to all counts and the capital specifications eight days later.  The penalty phase of the trial commenced on May 20, 2005.  That same day, the jury recommended that Frazier be sentenced to death.  The trial court accepted the jury's recommendation and sentenced Frazier to death on June 15, 2005.

Frazier filed a timely direct appeal of the trial court's decision to the Supreme Court of Ohio, represented by Attorneys Spiros Cocoves and Ann Baronas, setting forth twenty-four propositions of law as follows:

7

1.   Errors in the mitigation phase jury instruction of a capital trial violate a defendant's constitutional rights and require resentencing.

2.   A criminal defendant is denied due process and equal protection of the law when the State exercises its peremptory challenges to exclude minority jurors in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

3.   It is error for a trial judge to indicate to prospective capital jurors, during the death qualification process, that if the law requires a death sentence they must vote to impose death as a sentence but if the law requires a life sentence they must consider voting for life as a sentence.

4.   Execution of a mentally retarded criminal defendant is cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution.

5.   A criminal defendant's trial counsel are ineffective when they fail to file motions to suppress statements made by the defendant and fail to seek suppression of search warrants in violation of his right to counsel and right to due process of law under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

6.   A criminal defendant's right to due process is violated and a trial court errs when it fails to dismiss a juror who has been contacted and tampered with during the course of trial.

7.   A trial court errs when it permits the admission of and argument of inadmissible evidence that is prejudicial to the defendant.

8.   The trial court's sentence as to counts two and three must be remanded to the trial court for resentencing in light of *State v. Foster*.

9.   The accused's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the State is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

10.  A prosecutor commits prejudicial error when he concedes that a criminal defendant's mental state is insufficient to enter a guilty plea but argues to a jury during the penalty phase that there are no mental health issues present.

11.  A trial court errs in a death penalty case when it denies a defense motion to have a complete copy of the prosecutor's file turned over to the court and sealed for appellate review.

12.    A criminal defendant is denied due process and the right to effective assistance of counsel where the actions of his trial counsel fall below any accepted standard of competence in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

13.    Prosecutorial misconduct during closing argument at the mitigation phase deprives a criminal defendant of a fair sentencing determination.

14.    The trial judge in a capital case may not hold an off-the-record *ex parte* discussion with the jury after they return their sentencing verdict but before the judge imposes sentence.

15.    Ohio's death penalty is unconstitutional both in the abstract and as applied.

16.    A trial court commits error to the prejudice of a criminal defendant where it permits a witness to render an expert opinion when that witness has not been qualified as an expert as required by Evid. R. 702.

17.    A criminal defendant is denied his right to effective assistance of counsel when trial counsel fails to object to the testimony of a witness who renders an expert opinion without being qualified as required by Evid. R. 702.

18.    The failure of the trial court to secure the presence of the accused or to obtain a waiver of such right, violates the accused's right under the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

19.    Lethal injection as administered in Ohio constitutes cruel and unusual punishment and violates Mr. Frazier's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article One, Sections Nine, Ten and Sixteen of the Ohio Constitution.

20.    Cumulative errors may deprive a criminal defendant and criminal appellant of a fair trial in violation of his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution.

21.    When a criminal defendant's trial counsel is deemed to have waived or failed to preserve issues, he was denied his right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section Ten, Article One of the Ohio Constitution.

22.    When counsel in a capital case do not adequately preserve the record for appellate purposes, they provide constitutionally ineffective assistance of counsel.

23.    A trial court errs where it concludes that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.

24.    A death sentence under the facts of this case is neither appropriate nor in proportion to the death sentences in other cases.

(ECF No. 13-1, Apx. B.)  The Ohio Supreme Court affirmed the trial court's opinion on October 10, 2007.  *State v. Frazier*, 115 Ohio St. 3d 139, 873 N.E.2d 1263 (Ohio 2007).  Concluding his direct appeals, Frazier filed a Petition for Writ of Certiorari to the United States Supreme Court, employing the same attorneys.  The Court denied the Petition on April 21, 2008.  *Frazier v. Ohio*, 553 U.S. 1015 (2008).

While his direct appeals were pending, Frazier filed a Petition for Post-Conviction Relief on May 15, 2006, represented by Attorney Kathryn Sandford.  He raised the following nine grounds for relief:

1.    Petitioner's convictions and sentence are void or voidable because he is mentally retarded and not subject to being executed.

2.    Petitioner Frazier's convictions and sentences are void and/or voidable because he was denied effective assistance of counsel during his capital trial for failing to obtain an expert in the field of mental retardation.

3.    Petitioner's death sentence is void or voidable because he received ineffective assistance of counsel during the mitigation phase of his capital trial. Defense counsel were ineffective for failing to conduct an adequate and reasonable investigation of Petitioner's background, and as a result, crucial mitigating evidence was not presented to the jury.

4.    Petitioner's convictions and sentence are void or voidable because his trial counsel failed to reasonably investigate, prepare, and present mitigating evidence regarding Frazier's character, history, and background, namely his extensive history of substance abuse.

10

5.  Petitioner's conviction and sentence are void or voidable because the death penalty as administered by lethal injection in the State of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law.

6.  Petitioner's judgment and sentence are void or voidable because his trial attorneys failed to present evidence to support their argument that the death penalty is applied in an arbitrary manner.

7.  Petitioner's convictions and sentence are void or voidable because the death penalty law permits the imposition of capital punishment in an arbitrary, capricious, and discriminatory manner due to the uncontrolled discretion afforded elected Lucas County prosecutors in determining when to seek the death penalty.

8.  Petitioner's convictions and sentences are void or voidable because Ohio's postconviction procedures do not provide an adequate corrective process, in violation of the Constitution.

9.  Petitioner's judgment and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his post-conviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial and have denied Petitioner his rights.

(ECF No. 13-1, Apx. C.)  The Lucas County Court of Common Pleas denied the Petition on October 24, 2007.  (ECF No. 17; App. to Return of Writ vol. 6, 56-69.)  The Court of Appeals for the Sixth District affirmed the trial court's decision.  *State v. Frazier*, No. L-07-1388, 2008 WL 4408645 (Ohio Ct. App. Sept. 30, 2008).  Thereafter, the Ohio Supreme Court declined to exercise jurisdiction over the case.  *State v. Frazier*, 121 Ohio St. 3d 1425, 903 N.E.2d 325 (Ohio 2009).

Frazier filed an Application to Reopen Direct Appeal pursuant to Supreme Court Practice Rule 11.6 on April 14, 2010, represented by Attorney David Doughten.  The Application raised three propositions of law, asserting that direct appellate counsel failed to raise the following issues:

11

1.  A capital defendant's right to testify and/or provide an unsworn statement is absolute.  He may not be deprived of these rights without an in-court hearing ensuring that the defendant is waiving the rights in a knowing, intelligent and voluntary manner.

2.  A trial court may not deprive a capital defendant of his right to allocution pursuant to Ohio Rule of Criminal Procedure 32(A)(1) without obtaining a knowing, intelligent and voluntary waiver.

3.  A capital defendant is denied his right to effective assistance of counsel when the actions of counsel or the failure of counsel to act deprive the defendant of his right to a full and fair penalty phase hearing.

The Ohio Supreme Court denied the Application on August 25, 2010, on the ground that Frazier failed to comply with the 90-day filing deadline.  *State v. Frazier*, 126 Ohio St. 3d 1541, 932 N.E.2d 336 (Ohio 2010).

**III.    Habeas Proceeding**

Frazier filed a Notice of Intention to file a Habeas Corpus Petition on May 27, 2009. (ECF No. 1).  Concurrently, he filed a Motion for the Appointment of Counsel and a Motion to Proceed In Forma Pauperis.  The Court granted both motions and appointed David Doughten and John Gibbons to represent Frazier. (ECF No. 7.)  On September 11, 2009, Frazier filed the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254.  (ECF No. 13.)

After requesting and receiving two extensions of time, the Respondent filed a Return of Writ on January 8, 2010.  (ECF No. 19.)   After requesting and receiving three extensions of time, Frazier  filed a Traverse on April 26, 2010.  (ECF No. 24.)  Respondent thereafter filed a Sur-Reply, rendering the matter ripe for disposition.  (ECF No. 25.)

**IV.    Petitioner's Grounds for Relief**

Frazier asserts fifteen (15) grounds for relief.  These grounds are as follows:

1.  Petitioner's convictions and sentence are void or voidable because he is mentally

12

retarded and not subject to being executed.

2.    Petitioner's convictions and sentences are void and/or voidable because he was denied effective assistance of counsel during his capital trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

3.    The prosecution failed to provide a valid, race-neutral reason as required by *Batson v. Kentucky*, 476 U.S. 79 (1986), for excluding potential minority jurors.

4.    The state trial court failed to hold a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954).  The failure to hold such a hearing denied Petitioner the ability to prove the actual bias in his case.

5.    Petitioner was denied the effective assistance of counsel during the culpability phase of the trial.

6.    Petitioner's death sentence is void or voidable because he received ineffective assistance of counsel during the mitigation phase of his capital trial.  Defense counsel were ineffective for failing to conduct an adequate and reasonable investigation of Petitioner's background, and as a result, crucial mitigating evidence was not presented to the jury.

7.    The prosecutor's improper comments during the penalty phase closing argument were designed to mislead the jury about what could be considered an aggravating factor.  The comments deprived Frazier of a fair penalty hearing.

8.    The trial court failed to hold a hearing, require a written waiver, or engage in any colloquy with Frazier to ensure that he understood that he had the right to provide the jury with an unsworn statement [during the penalty phase] and that he knowingly, intelligently and voluntarily waived that right.

9.    The trial court failed to hold a hearing, require a written waiver, or engage in any colloquy with Frazier to ensure that he understood that he had the right to allocution under Ohio law and that he knowingly, intelligently and voluntarily waived that right.

10.   The trial court failed to hold a hearing, require a written waiver, or engage in any colloquy with Frazier to ensure that he understood that he had the right to be present at all critical stages of trial to ensure that he knowingly, intelligently and voluntarily waived that right.

11.   Frazier was denied his right to effective assistance of counsel in his direct appeal to the Ohio Supreme Court, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

12.     Petitioner's conviction and sentence are void or voidable because the death penalty as administered by lethal injection in the State of Ohio violates his constitutional rights to protection from cruel and usual punishment and to due process of law.

13.     The Ohio Supreme Court's arbitrary refusal to review life sentences imposed in similar cases as part of the statutorily mandated proportionality review denied Frazier due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.

14.     The effect of cumulative error during the trial deprived Frazier of a fair trial.

15.     The Ohio death penalty scheme is unconstitutional.

(ECF No. 13, *passim*.)

## V.      Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  In *Lindh v. Murphy*, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the provisions of the AEDPA apply to habeas corpus petitions filed after that effective date.  *See also Woodford v. Garceau*, 538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) ("It is now well settled that AEDPA applies to all habeas petitions filed on or after its April 24, 1996 effective date.").  Because Frazier's petition was filed on September 11, 2009, the AEDPA governs this Court's consideration of his petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford*, 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). The requirements of the AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551

U.S.1, 127 S. Ct. 2218, 2224 (2007) (citations omitted).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim --
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as determined by the Supreme Court of the
> > United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the
> > facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a

consideration of both the state court's statement and/or application of federal law and its finding

of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the

holdings, as opposed to *dicta*, of the United States Supreme Court's decisions as of the time of

the relevant state court decision.  *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028

(6th Cir. 2000).  The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1)

are independent tests and must be analyzed separately.  *Williams*, 529 U.S. at 412-13; *Hill v.

Hofbauer*, 337 F.3d 706, 711 (6th Cir. 2003).  A state court decision is "contrary to" federal law

only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on

a question of law or if the state court decides a case differently than [the Supreme] Court has on a

set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas

court may still grant the petition if the state court makes an "unreasonable application" of "that

principle to the facts of the particular state prisoner's case."  *Williams*, 529 U.S. at 413.  A state

court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Id.* at 407; *Hill*, 337 F.3d at 711.  As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  *Id.*

The Supreme Court recently emphasized the limited nature of review under Section 2254(d)(1) in *Harrington v. Richter*, – U.S. –, 131 S. Ct. 770 (2011).  It cautioned that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and that "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id.* at 786 (quoting *Yarborough*, 541 U.S. at 664).

The Supreme Court interpreted the "unreasonable determination of the facts" clause in Section 2254(d)(2) in *Wiggins v. Smith*, 539 U.S. 510 (2003).  In that case, the Court noted that a "clear factual error," such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant, constitutes an "unreasonable determination of the facts in light of the evidence presented."  *Id.* at 528-29.  In

16

other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court, which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001) ("regardless of whether we would reach a different conclusion were we reviewing the case *de novo*, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary"). This presumption only applies to basic, primary facts, and not to mixed questions of law and fact. *See Mason*, 325 F.3d at 737-38 (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were adjudicated on the merits in the state court proceeding.  *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, but rather conducts a *de novo* review of the claim.  *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007) (citations omitted); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).  If the state court conducts a harmless error analysis but does not indicate whether its finding is based on state or federal constitutional law, however, a habeas court, while conducting an independent review of the facts and applicable law, must nonetheless determine "whether the state court result is contrary to or unreasonably applies clearly established federal

17

law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) (citing *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)).

**VI.     Exhaustion and Procedural Default**

**A.     Exhaustion**

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b), (c); *Rose v. Lundy*, 455 U.S. 509 (1982). Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on the claims.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  *Rust*, 17 F.3d at 160.[1]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court."  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)) (internal quotation marks omitted).  Rather than dismiss certain claims the Court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In

---

[1] The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of *res judicata* an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

18

circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim. *Buell*, 274 F.3d at 349.  To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits. *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

**B.**     **Procedural Default**

**1.**     **General Law**

In general, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001) (citing *Coleman*, 501 U.S. at 732-33).  To be adequate, a state procedural rule must be "'firmly established and regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, – U.S. – , 130 S. Ct 612, 618 (2009).  If a petitioner fails to fairly present any federal

habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims. *O'Sullivan v. Boerckel*, 526 U.S. at 848; *Rust v. Zent*, 17 F.3d at 160.

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule. It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction -- that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

In determining whether the *Maupin* factors are met, the federal court looks to the last explained state court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). "'[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007) (quoting *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir. 2003)). Conversely, if the last state court to be presented with a particular federal claim reaches the merits, then the procedural bar is removed and a federal habeas court may consider

the merits of the claim in its review.  *Ylst*, 501 U.S. at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted.  However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review.  *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-75.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp. 2d 796, 801 (E.D. Mich. 2002).  Objective impediments include an unavailable claim, or interference by officials that made compliance impracticable.  *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp. 2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes cause.  *Murray*, 477 U.S. at 488-89; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994); *Mohn*, 208 F. Supp. 2d at 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  *Murray*, 477 U.S. at 488-89.  If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim.  *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495-96).  When the Supreme Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

### 2.     Frazier's Procedural Default Arguments

#### a.     not consistently applied

During post-conviction proceedings, Ohio courts can hold that a claim is barred by *res judicata* based on the holding in *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E.2d 104 (Ohio 1967). In that case, the Ohio Supreme Court held that a final judgment of conviction bars a convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised *or could have been raised* by the

22

defendant at the trial on the merits, or on appeal from that underlying judgment.  *Id.* at 180, 226

N.E.2d at 108; *see also State v. Roberts*, 1 Ohio St. 3d 36, 39, 437 N.E.2d 598, 601 (Ohio 1982)

(holding policy behind *Perry* bars post-conviction petitioners from raising issues that could have

been raised on direct appeal in a collateral proceeding to avoid reversal of conviction based on

collateral, rather than constitutional, issues).  Thus, unless a claim is based on evidence *dehors*

(outside of) the record, it must be raised during direct appeal, or be deemed waived.

Frazier argues in the Traverse that the *Perry* doctrine is not an "adequate" rule under

*Maupin*.  (ECF No. 24, 6-11.)  A procedural rule is not "adequate" unless, among other things, it

is regularly and consistently applied.  *See Warner v. United States*, 975 F.2d 1207, 1213 (6th Cir.

1992), *cert. denied*, 507 U.S. 932 (1993) (stating that the rule only applies to "firmly established

and regularly followed state practices") (citing *Ford v. Georgia*, 498 U.S. 411, 422 (1991)).

Thus, Frazier concludes, because of the Ohio courts' inconsistent application of *Perry*, this Court

need not defer to an Ohio court's finding of a *Perry* violation.

To support his argument, Frazier cites to several capital cases in which the Ohio Supreme

Court, on direct appeal, *sua sponte* addressed the merits of claims the court of appeals had

concluded were barred by *res judicata*, or considered claims that had not even been raised in the

court of appeals and, thus, *should have been* barred by *res judicata*.

Some of the cases relied upon by Frazier clearly do not support his argument and are, in

fact, inapposite.  For instance, in each of the following three cases, a well-established exception

to the *res judicata* doctrine applied, or the court did not actually engage in a merits review.  For

example, Frazier relies on *State v. Buell*, 22 Ohio St. 3d 124, 142, 489 N.E.2d 795, 811 (Ohio

1986).  In *Buell*, the court analyzed the constitutionality of the imposition of the death penalty in

light of the recently decided United States Supreme Court decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1987), even though the appellant did not raise the issue at trial, or in his appeal to the Ohio Supreme Court.  The reason the Ohio Supreme Court considered the claim *sua sponte* was that it *could not have been raised before*.  *Caldwell* was decided in 1985, after Buell's appeal had been filed and resolved by the Ohio court of appeals.

Similarly, in *State v. Huertas*, 51 Ohio St. 3d 22, 553 N.E.2d 1058 (Ohio 1990), the Ohio Supreme Court resolved an issue and ultimately granted relief on the basis of a Supreme Court opinion, *Booth v. Maryland*, 482 U.S. 496 (1987), *overruled by Payne v. Tennessee*, 501 U.S. 808 (1991), which was issued after the appellant's trial and after the appeal had been filed, but before the appellate court issued its decision.  *Id.*  *Booth* held that the use of victim impact evidence during the penalty phase of a capital trial is unconstitutional.  There is no indication in the opinion itself that the petitioner had failed to raise a claim based on the use of victim impact statements.  Thus, it is possible the *claim* had been raised below, even if the appellant could not have relief based on *Booth*.  Thus, *Huertas* is unhelpful to Frazier.

Frazier's reliance on *State v. Rogers*, 32 Ohio St. 3d 70, 512 N.E.2d 581 (Ohio 1987), suffers from the same defect.  The court considered a claim based on the prosecutor's evidentiary use of the petitioner's post-*Miranda* exercise of his right to silence, in violation of the recently decided *Wainwright v. Greenfield*, 474 U.S. 284 (1986).  As in *Huertas* and *Buell*, the United States Supreme Court decision was issued after the appellant's direct appeal to the court of appeals, and, thus, the appeal to the Ohio Supreme Court presented the earliest opportunity for raising the claim.

In other cases, however, the Ohio Supreme Court did appear to ignore the *res judicata* bar

24

and address the appellant's claims on the merits without explaining why it was doing so.  *See State v. Williams*, 38 Ohio St. 3d 346, 528 N.E.2d 910 (Ohio 1988) ("Because of the gravity of the sentence that has been imposed on appellant, we have reviewed the record with care for any errors that may not have been brought to our attention.  In addition, we have considered any pertinent legal arguments which were not briefed or argued by the parties."); *State v. Hamblin*, 37 Ohio St. 3d 153, 524 N.E.2d 476 (Ohio 1988) ("Because this is a capital case, we will review all five arguments [even those not raised below] relating to the claim of ineffective assistance of counsel."); *State v. Esparza*, 39 Ohio St. 3d 8, 529 N.E.2d 192 (Ohio 1988) (considering issue of jury venire, even though it was "challenge[d] for the first time on appeal"); *State v. Barnes*, 25 Ohio St. 3d 203, 495 N.E.2d 922 (Ohio 1986) (stating, "since the instant argument was neither raised before, nor ruled on by, the court of appeals, this court is not required to address it on the merits," but addressing the claim anyway).[2]

That the Ohio Supreme Court occasionally chooses to address the merits of the claims that are otherwise barred from review on the basis of *res judicata* does not mean that Ohio's law of *res judicata* is so inconsistent as to be inadequate, however.  Rather, these are the exceptions that prove the rule.  There has been no showing that because of the above-mentioned exceptions, Frazier or other capital habeas petitioners *reasonably* came to believe the *Perry* rule had been abandoned in capital cases.  Thus, there was no basis to conclude the exception had become the rule, or that it would have been reasonable for a petitioner to assume it had.[3]

---

[2] In virtually every case in which the Ohio Supreme Court has forgiven a procedural default and addressed a claim on its merits, the court has concluded the claim was without merit.

[3] The Ohio Supreme Court has expressly rejected the argument that procedural bars are or should be less strictly enforced in capital cases. It stated,

Ultimately, Frazier's argument is unpersuasive.  The Sixth Circuit specifically has held that Ohio's application of the *res judicata* doctrine under *Perry* is an adequate and independent state ground.  *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) ("This court has held that [the *Perry* rule] is regularly and consistently applied by Ohio courts as required by the four-part *Maupin* test.") (citing *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000)).  *See also Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999), *cert. denied*, 528 U.S. 946 (1999) (noting that the *Perry* rule has been consistently applied).  Consequently, any claim that the Ohio courts assert is barred by the *Perry* rule is procedurally defaulted.

### b.      post-conviction system violates due process

Frazier also asserts a broad challenge to the constitutionality of Ohio's post-conviction system, contending that Ohio's post-conviction bar of *res judicata* does not satisfy due process requirements.  According to Frazier, Ohio's post-conviction system is designed to create procedural defaults for the sake of judicial convenience, and provides no meaningful opportunity for petitioners to identify, investigate, or prove constitutional violations.  The thrust of his argument seems to be that Ohio's post-conviction practice makes compliance with its procedural requirements so difficult that petitioners are set up for failure.  (ECF No. 24, 12-13.)  This argument is unpersuasive.

In support of his argument, Frazier relies on *Easter v. Endell*, 37 F.3d 1343, 1345 (8th Cir.

---

> The mere fact that punishments differ provides no basis to assert that procedural rules should differ in their application to the crime charged.  We hold that capital defendants are not entitled to special treatment regarding evidentiary or procedural rules. . . .  We will utilize the doctrine of waiver where applicable; yet we must also retain the power to *sua sponte* consider particular errors under exceptional circumstances.

*State v. Greer*, 39 Ohio St. 3d 236, 244, 530 N.E.2d 382, 394 (Ohio 1988).

1994); *Harmon v. Ryan*, 959 F.2d 1457, 1462 (9th Cir. 1992); and *Kim v. Villalobos*, 799 F.2d 1317, 1321 (9th Cir. 1986).  None of these cases supports Frazier's argument that *Ohio's* application of *res judicata* in post-conviction proceedings violates due process.

In *Easter*, the petitioner pleaded guilty to various crimes in an Arkansas state court in December 1989.  At the time, Arkansas did not allow those who pleaded guilty to appeal; in addition, Arkansas had no real post-conviction system in place.  A year after Easter's guilty plea and conviction, Arkansas erected a post-conviction procedure (Rule 37) that allowed for the review of guilty pleas.  However, petitions containing such challenges were required to be filed within ninety days of judgment.  The Arkansas Supreme Court subsequently held that individuals who had pleaded guilty during the period in which Rule 37 was *not* in effect had a right to challenge their guilty pleas under the rule.  *State v. Fox*, 832 S.W.2d 244 (Ark. 1992).  The Arkansas Supreme Court also said, however, that such challenges still had to be made within the ninety day period.  Easter filed a Rule 37 petition, and it was denied as untimely.  Easter raised a challenge to his guilty plea on federal habeas review, and the district court held that the claim was procedurally defaulted.

The Eighth Circuit Court of Appeals reversed.  The court held that the *Fox* procedural bar was not adequate *as to Easter*,[4] because it was not a firmly established rule when applied to him.[5] *Easter*, 37 F.3d at 1345.  In this case, Frazier has not shown that any of his procedural defaults

_____

[4]   The Court was careful to point out that "Arkansas' post-conviction procedures as embodied by *Fox* are not *in themselves* constitutionally infirm."  *Easter*, 37 F.3d at 1346.

[5]   This was an application of the Supreme Court's decision in *Ford v. Georgia*, 498 U.S. 411 (1991) (holding that a state procedural rule that was not clearly defined before the default is not an adequate state ground for purposes of determining procedural default).

were due to a procedural rule that was not firmly established at the time it was applied to him.[6]

 *Harmon* also offers no support for Frazier's claim.  In *Harmon*, the district court dismissed the petitioner's habeas corpus petition because he had failed to pursue a direct appeal in the Arizona Supreme Court first.  The Ninth Circuit reversed, holding, basically, that the Arizona Supreme Court had misled the petitioner about what he needed to do to exhaust his state remedies.  The Ninth Circuit held that the petitioner's default was due to the fact that, prior to its occurrence, the Arizona Supreme Court expressly held that "'[o]nce the defendant has been given the appeal to which he has a right [*i.e.*, in the state intermediate appellate court], state remedies have been exhausted.'"  *Harmon*, 959 F.2d at 1463 (quoting *State v. Shattuck*, 684 P.2d 154, 157 (Ariz. 1984)).  Thus, the Ninth Circuit concluded, in light of *Shattuck*, it was reasonable for an Arizona defendant to believe that an appeal to the Arizona appeals court was all that was needed to exhaust his state remedies before pursuing a federal habeas action, and the failure to appeal to the Arizona Supreme Court was excused.  Here, Frazier has not pointed to a single decision that misled him about his obligations.

 Likewise, *Kim* does not assist in Frazier's argument.  In *Kim v. Villalobos*, 799 F.2d at 1321, the Ninth Circuit held that where a *pro se* prisoner's failure to plead his claims with particularity resulted in his being unable to pursue post-conviction relief, the procedural default would be excused.  Here, there is no such obstacle to Frazier, who was represented by counsel throughout his appeal and post-conviction proceedings.  Accordingly, this argument fails.

---

 [6] *Pearson v. Norris*, 52 F.3d 740 (8th Cir. 1995), also involved Arkansas Rule 37.  In *Pearson*, the court held that since any attempt by the petitioner to file an untimely Rule 37 petition would be rejected by the Arkansas courts, the claim should be addressed by the federal district court on the merits.

Finally, Frazier asserts that this Court should excuse any procedural default for claims barred by the *Perry* doctrine if they are based on evidence *dehors* the record.  The Court declines to express a general conclusion regarding this issue and will address this argument as it is raised in regard to Frazier's individual grounds for relief.

**VII.**    **Analysis of Petitioner's Grounds for Relief**

   **A.**    ***First and Second Claims for Relief: Mental Retardation and Related Ineffective Assistance of Counsel***

Frazier's first claim for relief is that he is mentally retarded pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and *State v. Lott*, 97 Ohio St. 3d 303, 305, 779 N.E.2d 1011, 1014 (Ohio 2002), and therefore ineligible for execution.  His second, related claim for relief is that his trial counsel provided ineffective assistance of counsel when they failed to mount an *Atkins* defense. Frazier acknowledges that these claims lie at the heart of his habeas action.  He requests oral argument and an evidentiary hearing on both claims.  (ECF No. 24, 3; ECF No. 28.)  Oral argument and an evidentiary hearing are not required.

   **1.**    **Mental Retardation**

In *Atkins v. Virginia*, the United States Supreme Court held that executing a mentally retarded offender violates the Eighth Amendment's ban on cruel and unusual punishment. *Atkins*, 536 U.S. at 321.  The Court recognized a national consensus that mentally retarded persons are less culpable and more prone to wrongful execution.  *Id.* at 318-21.  The *Atkins* Court did not provide a definition for "mental retardation," rather, as the Supreme Court did in the context of mental competency, it entrusted the states with the "task of developing appropriate ways to enforce the constitutional restriction" upon the execution of their sentences.  *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)).

29

The Ohio Supreme Court soon complied, ruling in *State v. Lott* that to establish an *Atkins* claim in Ohio, the defendant must prove that he or she:  (1) suffers from "significantly subaverage intellectual functioning," (2) experienced "significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction," and (3) manifested "onset before the age of 18."  *Lott,* 97 Ohio St. 3d at 305, 779 N.E.2d at 1014.  The *Lott* court noted, however, that "[w]hile IQ tests are one of the many factors that need to be considered, they alone are not sufficient to make a final determination on this issue."  It therefore held that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70."  *Id*.

Because a finding of mental retardation typically is a disputed factual issue, the *Lott* court opined that it was best resolved in the trial courts, where the parties could adduce evidence regarding a petitioner's mental status.  It further held that the trial courts should conduct a *de novo* review of the evidence, making findings by "rely[ing] on professional evaluations of [a petitioner]'s mental status, and consider[ing] expert testimony, appointing experts if necessary."  *Id.* at 306, 779 N.E.2d at 1015.  The *Lott* court also held that the petitioner bears the burden of proving his or her mental retardation by a preponderance of the evidence standard.  *Id.* at 307.

### a.    Procedural Default

Respondent asserts that Frazier's *Atkins* claim is procedurally defaulted because Frazier's counsel waived this claim at trial and because the claim was barred from state court review under Ohio's *res judicata* doctrine.  (ECF No. 19, 15.)  Frazier's principal argument in response is that an *Atkins* claim cannot be waived, and that even if it can, any procedural bar should be excused under the "actual innocence" exception.  (ECF No. 24, 15.)  For the following reasons, the Court finds the claim defaulted.

30

### i.       history of Frazier's *Atkins* claim

In a pretrial motion, Frazier's trial counsel requested that Frazier be examined to determine whether he is mentally retarded.  (Trial Tr. vol. 1, 170.)   The trial court approved the request, and Frazier was evaluated by Jeffrey Smalldon, Ph.D, a specialist in forensic psychology who has provided expert testimony in nearly 200 capital cases in the past 13 years.  Dr. Smalldon interviewed Frazier twice, reviewed information about him obtained through a background investigation, and administered a battery of tests.  Those tests included the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"), which resulted in a verbal IQ score of 77, a performance IQ of 72, and a full-scale IQ of 72.  Dr. Smalldon concluded that Frazier's IQ placed him in the "gray area" just above mild mental retardation and on the low end of "borderline" for normal intelligence.  (App. To Return of Writ vol. 10, 2014, 2021, 2043; App. to Return of Writ vol. 9, 1-17.)

At the State's request, Gregory E. Forgac, Ph.D, a clinical psychologist at the Court Diagnostic and Treatment Center in Toledo, also evaluated Frazier.[7]  Dr. Forgac also gave administered the WAIS-III test on Frazier, which resulted in a verbal IQ of 81, a performance IQ of 73, and a full-scale IQ of 75.  He, too, determined that Frazier was not mentally retarded.  (*Id.* at 23-29.)

At a pretrial hearing on May 3, 2005, trial counsel withdrew its Motion to Dismiss the Death Specifications on *Atkins* grounds.  Counsel explained to the court that his decision to

---

[7]  Dr. Forgac had evaluated Frazier earlier, at defense counsel's request, to determine whether he was competent to stand trial.  Based upon Dr. Forgac's report and evidence before the court, the court found Frazier competent to stand trial at a hearing on April 15, 2004.  (Trial Tr. vol. 2, 2-3.)

withdraw the motion was based upon "the written report prepared by Forgac, as well as [his]

lengthy discussions with him and [his] lengthy discussions with Dr. Smalldon, who had initially

seen Mr. Frazier . . . ." (Trial Tr. vol. 2, 3-4.)

The court accepted the withdrawal, but with caution.  On the morning of the trial, May 9,

2005, the court elicited on the record a full explanation from defense counsel as to why he

withdrew Frazier's *Atkins* motion.  The following dialogue took place:

> The Court: . . . I just wanted to make certain that the law states and that it's Mr.
> Frazier's understanding that 70-plus IQ is a rebuttable presumption that the
> defendant is not mentally retarded but it can be rebutted with other evidence. . . .
> [I]f you could speak to why you made the request to withdraw the motion.
>
> Mr. Berling: Yes. Your Honor, we had an early indication that mental retardation would
> be an issue in this case . . . [which] did give rise to our request to have Mr. Frazier
> evaluated both by Dr. Jeffrey Smalldon and Dr. Forgac . . . .
>
> As a result of the tests that they administered – and they administered the
> whole range, the full battery of tests designed to test for mental retardation – their
> numbers are virtually identical.  And after lengthy discussions of an hour or two
> with each of those individuals, they could not say that Mr. Frazier is mentally
> retarded.  In fact, he would be well above the level of rebuttal [sic] presumption
> based upon his functional adaptation and all of the other factors that are listed in
> the Atkins case.  And we went through with each doctor each and every [sic] of
> those factors, and their testimony would not be supportive.

(Trial Tr. vol. 3, 34-35.)  The court also had the following colloquy with Frazier on the record

about his understanding of the withdrawal:

> The Court: . . . And, Mr. Frazier, do you understand what we're talking about when
> we talk about --
>
> The Defendant: Sort of.  Not in whole terms.  I know what we're talking about my mental
> status and everything, I understand what he's saying, IQ and so forth and so on, yes.
>
> The Court: And your attorney, because of the exams that you were administered by the
> two doctors –
>
> The Defendant: Yes.

The Court: –that they found that in their opinion that you did not meet the standard to be considered for mental retardation.  That's the reason why your attorney chose to withdraw the motion.

The Defendant: I understand that.

(*Id*. at 35-36.)

At the sentencing phase of the trial, the defense presented evidence concerning Frazier's mental and psychological state and history, primarily through Dr. Smalldon.  No other mitigation witnesses were called to testify, and Frazier did not make a statement on his own behalf.  *Frazier*, 2008 WL 4408645, at *3-5.

Frazier asserted his *Atkins* and *Atkins*-related ineffective assistance of counsel claims on direct appeal to the Ohio Supreme Court.  The court denied these claims, and affirmed Frazier's convictions and sentence.  *Frazier*, 115 Ohio St. 3d at 160-64, 873 N.E.2d at 1290-93.  In doing so, it ruled for the first time that a defendant can waive an *Atkins* claim, and that absent plain error, Frazier had waived appellate review of his *Atkins* claim by withdrawing his *Atkins* motion at trial.  *Id*. at 161, 873 N.E.2d at 1291.

The court then applied a plain error analysis and found "no error, plain or otherwise," concluding that Frazier's mental retardation claim was "overrule[d]."  *Id.* at 162.  It noted Frazier's IQ scores and Dr. Smalldon's testimony that the results "are pretty good numbers," and rejected Frazier's claim that the margin of error places him within the borderline mentally retarded range.  *Id.*  It also found Frazier's evidence of the Social Security Administration's diagnosis of Frazier as mentally retarded unpersuasive, since "Frazier has presented neither the IQ test score nor the criteria that the Social Security officials used in making this diagnosis."  *Id.*  Finally, the court rejected Frazier's argument that evidence that he lived in subsidized housing for

33

the elderly and disabled at the time of the murder, as well as evidence of his poor grades in school, erratic employment history, and failed marriage and other poor relationships demonstrated significant limitations in his adaptive skills.  It reasoned that "Frazier provides no support for these claims," and neither Drs. Forgac nor Smalldon found the requisite limitations.  *Id.*

Frazier filed a post-conviction petition including his *Atkins* and *Atkins*-related ineffective assistance claims, for which he requested an evidentiary hearing.  Frazier supported his petition with affidavits and other documentary evidence.  He submitted the affidavit and report of Timothy Rheinscheld, Ph.D., who reviewed and evaluated Dr. Smalldon's report and trial testimony, medical records and other materials relating to Frazier.  Dr. Rheinscheld stated that tests administered by Dr. Smalldon placed Frazier's IQ at 72, which is within the standard deviation of plus or minus five points and allows for a possible IQ of less than 70.  He also stated, based on Frazier's school records, that Frazier's mental disability manifested in both elementary and high school, and he had significant limitations in adaptive functions in work and functional academic skills.  (App. to Return of Writ vol. 5, 104-05.)  Frazier additionally submitted an affidavit from an employee of the Social Security Administration, verifying the agency's determination that Frazier was mentally retarded and recounting his sporadic employment history, and affidavits from Frazier's siblings who stated they would have testified at trial about his mental status if asked.  (*Id.* at 120-27.)

The post-conviction court found that Frazier's *Atkins* and *Atkins*-related ineffective assistance claims were barred by the doctrine of *res judicata*, since they were raised and argued to the Ohio Supreme Court.  (*Id.* at 291-93.)  Frazier appealed, arguing that the trial court erred by dismissing his claims as *res judicata* without at least holding a hearing or allowing him to conduct

34

discovery.

The Court of Appeals for the Sixth District affirmed the post-conviction court's decision that Frazier's *Atkins* claims were barred by *res judicata*, holding that Frazier presented no new evidence to support the claims and thereby avoid the procedural bar. It explained, "[T]he record shows that Smalldon testified as to the criteria necessary for a finding of mental retardation pursuant to *Atkins*, and Rheinscheld's affidavit contains no new evidence dehors the record which was not available at the time of trial." *Frazier*, 2008 WL 4408645, at *11.

### ii.     waiver

Frazier contends that the issue of whether a defendant is death eligible under *Atkins* cannot be waived. (ECF No. 24, 15.) The Ohio Supreme Court's ruling that Frazier's withdrawal of his *Atkins* motion resulted in a waiver of that claim, however, is well-grounded in both Ohio and federal law.

The Ohio Supreme Court has held that "capital defendants are not entitled to special treatment regarding evidentiary or procedural rules. . . . We will utilize the doctrine of waiver where applicable; yet we must also retain power to *sua sponte* consider particular errors under exceptional circumstances." *State v. Greer*, 39 Ohio St. 3d 236, 244, 530 N.E.2d 382, 394 (Ohio 1988). It has defined waiver as "the intentional relinquishment or abandonment of a right." *State v. Payne*, 114 Ohio St. 3d 502, 506, 873 N.E.2d 306, 311 (Ohio 2007).

The United States Supreme Court also has ruled that a constitutional right can be waived by the failure to timely assert it. *Breard v. Greene*, 523 U.S. 371, 376 (1998) (rules of procedural default apply to constitutional provisions). The Court has pronounced, "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well

35

as civil cases by the failure to make timely assertion of the right before a tribunal having

jurisdiction to determine it."  *Coleman v. Thompson*, 501 U.S. 722, 751 (1991) (internal citation

and quotation omitted).

The Supreme Court explained the reason for enforcing waivers of constitutional rights in

*Wainwright v. Sykes*, 433 U.S. 72, 90 (1977).  In that case, it held that a petitioner's waived

objection to the admission of a confession resulted in procedural default.  In defending Florida's

contemporaneous objection rule, the Court stated that a criminal case in state court is a "decisive

and portentous event" that must be "the 'main event,' so to speak, rather than a 'tryout on the

road' for what will later be the determinative federal habeas hearing."  It explained,

> A defendant has been accused of a serious crime, and this is the time and place set
> for him to be tried by a jury of his peers and found either guilty or not guilty by
> that jury.  To the greatest extent possible all issues which bear on this charge
> should be determined in this proceeding:  the accused is in the box, the judge is on
> the bench, and the witnesses, having been subpoenaed and duly sworn, await their
> turn to testify.  Society's resources have been concentrated at that time and place in
> order to decide, within the limits of human fallibility, the question of guilt or
> innocence of one of its citizens.

*Id.*

The *Atkins* Court itself emphasized the primary role of the trial court as fact-finder when it

vested state courts with the task of defining and determining which offenders were mentally

retarded and therefore protected.  It observed,

> To the extent there is serious disagreement about the execution of mentally
> retarded offenders, it is in determining which offenders are in fact retarded. . . .
> Not all people who claim to be mentally retarded will be so impaired as to fall
> within the range of mentally retarded offenders about whom there is a national
> consensus.

*Atkins,* 536 U.S. at 317.  The Supreme Court reaffirmed this principle in *Bobby v. Bies*, stating,

"Recourse first to Ohio's courts is just what this Court envisioned in remitting to the States

36

responsibility for implementing the *Atkins* decision." *Bies*, – U.S. –, 129 S. Ct. 2145, 2153-54 (2009).

Indeed, the Sixth Circuit Court of Appeals, in *In re Bowling*, 422 F.3d 434 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1353 (2005), affirmed the Kentucky Supreme Court's holding that a capital defendant procedurally defaulted his *Atkins* claim because he failed to assert the claim at trial. *Id*. at 439.  The court noted that the petitioner first asserted his claim that he is mentally retarded in a second or successive petition in federal court, fourteen years after his trial and only months before his execution date and shortly after the Supreme Court declined to review his first habeas petition. *Id*.  The court further concluded that the petitioner could not make the required prima facie showing for a second habeas petition that he is mentally retarded, because his IQ scores were higher than what Kentucky law considers to be "significantly subaverage intellectual functioning," and because evidence of his limitations in functioning did not show mental retardation but are just as indicative of the other psychological disorders from which he suffers. *Id.*

Other courts also have found *Atkins* claims waived at trial and therefore procedurally barred from review. *See Winston v. Commonwealth*, 268 Va. 564, 617, 604 S.E.2d 21, 51 (Va. 2004) ("Winston's remaining claims concerning the subject of mental retardation are waived because he deliberately declined to raise a claim of mental retardation under the statutory provisions that apply to him and his trial."); *Head v. Hill*, 277 Ga. 255, 259, 587 S.E.2d 613, 620 (Ga. 2003) (defendant could have litigated the issue of his alleged mental retardation at trial but chose not to do so, thus, he was not denied the right to litigate the issue; he had such a right and waived it). Se*e also Sawyer v. Whitley*, 945 F.2d 812, 823-34 (5th Cir. 1991), *aff'd, Sawyer v.*

*Whitley*, 505 U.S. 333 (1992) (claim of incompetency to stand trial partially because of mental retardation procedurally defaulted where not asserted at trial).

Here, Frazier received the full panoply of rights afforded a defendant in a capital trial.  He initially intended to file an *Atkins* motion, and was provided with a well-known expert at his request to prepare a report for that motion.  A court-appointed expert also examined and evaluated Frazier for that purpose.  Once his counsel withdrew the *Atkins* motion, the court was careful to ensure, on the record, that there were solid grounds for doing so, and that Frazier understood and agreed to the withdrawal.  In addition, the Ohio Supreme Court, on direct appeal, applied a plain error analysis to the claim to further ensure that there was no miscarriage of justice in denying it.

Both *Atkins* and *Lott* considered the trial to be the proper forum in which to resolve claims of mental retardation.  Frazier knowingly waived the right to have his claim heard there, and by that waiver, his *Atkins* claim is procedurally defaulted.

### iii.    *res judicata*

Respondent contends that Frazier also is procedurally barred from raising his *Atkins* claim by the doctrine of *res judicata*.  (ECF No. 19, 15.)  Frazier responds that Ohio's *res judicata* rule does not satisfy the adequate and independent prong of *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), and therefore should not be enforced.  In the alternative, he argues that the *res judicata* rule will not procedurally bar his *Atkins* claim because he submitted evidence *dehors* the record to support it to the post-conviction court.  (ECF No. 24, 14.)

As explained above, *supra* Section VI.B.2.a, the Sixth Circuit consistently has held that Ohio's *res judicata* doctrine, established in *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E.2d 104 (Ohio 1967), is an adequate and independent state ground to procedurally bar claims asserted in

federal habeas actions.  *See, e.g., Durr v. Mitchell,* 487 F.3d 423, 432 (6ᵗʰ Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337, 349 (6ᵗʰ Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6ᵗʰ Cir. 2000).

To satisfy the "new evidence" exception to Ohio's *res judicata* doctrine, "[t]he outside evidence must meet a threshold level of cogency."  *State v. Lynch*, No. C-010209, 2001 WL 1635760, at *3 (Ohio App. Dec. 21, 2001).  Such evidence "must be 'competent, relevant and material' to the claim, be more than marginally significant, and advance the claim 'beyond mere hypothesis and a desire for further discovery.' . . .  Thus, it must not be cumulative of or alternative to evidence presented at trial."  *State v. Fears*, No. C 990050, 1999 WL 1032592, at *3 (Ohio App. Nov. 12, 1999) (citations omitted).  "Therefore, to overcome the res judicata bar, it is not sufficient for the petitioner to simply present evidence outside the record, he must also demonstrate that the evidence was not available at the time of his trial, or at the time of his direct appeal."  *State v. Jones*, No. 2001-A-0072, 2002 WL 31812945, at *3  (Ohio App. Dec. 13, 2002).[8]

Thus, expert testimony that is *dehors* the record does not overcome the bar of *res judicata* if the defendant could have presented the testimony at trial, and if the techniques used for analyzing the data were available at the time of the trial.  An Ohio appellate court has held, "A review by a second expert of an expert's analysis of scientific data presented at trial is not 'new evidence.'"  *State v. Richey*, No. 12-97-7, 1997 WL 722782, at *2 (Ohio App. Nov. 18, 1997).

Here, the post-conviction court ruled that Frazier's *Atkins* claim was barred by the doctrine

---

[8]  Examples of evidence *dehors* the record that would overcome *res judicata* include: evidence withheld by the state; an affidavit by a witness sworn to after the trial in which the witness states that his testimony at trial was false; and a DNA finding in cases that were heard before the use of DNA evidence.  *Jones,* 2002 WL 31812945, at *3 n.2.

of *res judicata*, since it was raised and argued to the Ohio Supreme Court.  And the court of appeals correctly affirmed that decision, holding that Frazier presented no new evidence through Dr. Rheinscheld's affidavit to support his *Atkins* claim and thereby avoid the procedural bar.  Dr. Rheinscheld's affidavit merely offered a new opinion as to Frazier's intellectual abilities; it was based on Dr. Smalldon's data, which was available at the time of trial.  Thus, Frazier's *Atkins* claim is procedurally defaulted on this ground as well.

### i.v.    actual innocence exception

Frazier asserts that he is actually innocent of the death penalty because he is mentally retarded, thereby overcoming any procedural default.  (ECF No. 24, 15-20.)  As noted above, the "miscarriage of justice" exception applies "where a constitutional violation has probably resulted in the conviction of one who is actually innocent," and permits review even in the absence of a showing of cause for the procedural default.  *Murray v. Carrier*, 477 U.S. 478, 495-96 (1985).  In the context of a death sentence, "actual innocence" means "that there was no aggravating circumstance or that some other condition of eligibility had not been met."  *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992).  When eligibility is at issue, the petitioner must "show by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."  *Id*. at 350.  This "exacting" standard ensures that the rule applies only in "extraordinary" cases "to avoid a manifest injustice."  *Schlup v. Delo*, 513 U.S. 298, 325, 327 (1995).

This Court agrees that if Frazier could prove that he is mentally retarded, he would satisfy the "clear and convincing" standard of the "miscarriage of justice" exception to procedural default.  However, as explained below, the Court finds that Frazier is not mentally retarded.

40

Frazier, therefore, cannot meet this heavy burden, and his *Atkins* claim is procedurally defaulted.[9]

### b.    Merits

Even if Frazier's *Atkins* claim were ripe for review, it lacks merit.  Frazier contends that "[t]he evidence adduced at trial was sufficient for the court or jury to have determined that [he] was ineligible for the death penalty" due to mental retardation, and that the affidavit of Dr. Rheinscheld buttresses this evidence of his mental status.  (ECF No. 24, 21.)  Respondent counters that Frazier has not satisfied any one of the three prongs of *Lott*'s standard for mental retardation. (ECF No. 19, 16.)

Frazier asserts that the Ohio courts made unreasonable findings of fact regarding Frazier's mental status, suggesting that this Court should review the courts' findings under the AEDPA's Section 2254(d)(2) standard of review.  (ECF No. 13, 15; ECF No. 24, 21.)  The Ohio Supreme Court conducted a plain error review of Frazier's *Atkins* claim, however, which does not qualify as an "adjudication on the merits" for purposes of  Section 2254(d).  *E.g., Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *see also State v. Long*, 53 Ohio St. 2d 91, 95, 372 N.E.2d 804, 807 (Ohio 1978) (citing *United States v. Rudinsky*, 439 F.2d 1074, 1076 (6th Cir. 1971) (noting that the plain error rule is invoked "only in exceptional circumstances to avoid a miscarriage of justice"). Thus, the deference due under the AEDPA does not apply, and this Court will conduct a *de novo* review of the claim.  *See, e.g., Murphy v. Ohio*, 551 F.3d 485, 498-99 (6th Cir. 2009); *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007).

---

[9]  Frazier did not specifically raise the argument that the ineffective assistance of his trial counsel "caused," and therefore excused, the procedural default of his *Atkins* claim. Nevertheless, this Court will necessarily address that issue when it analyzes Frazier's *Atkins*-related ineffective assistance claim on the merits.

The issue, then, is simply:  has Frazier proven by a preponderance of the evidence that he is mentally retarded as required by *Lott*?   After a careful review of the record, this Court concludes that he has not.[10]

### i. significantly subaverage intellectual functioning

As explained above, the *Lott* Court held that "there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70."  *Lott*, 97 Ohio St. 3d at 305, 779 N.E.2d at 1014.  Frazier's two full-scale IQ scores from the WAIS III test were 72 and 75.  His verbal IQ scores were a bit higher, 77 and 81; and his performance or non-verbal IQ scores were close to his full-scale test results, 72 and 73.[11]

---

[10]  Because this Court finds no merit in Frazier's *Atkins* claim, the issue of whether he is entitled to an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2) is denied as moot.  *See Bowling v. Kentucky,* 163 S.W.3d 361, 382-83 (Ky. 2005), *cert. denied,* 546 U.S. 1017 (2005) ("Not every defendant who claims to be mentally retarded is entitled to a hearing on the issue. . . . [T]here must be at least a prima facie showing that the defendant may, in fact, be mentally retarded.")*; State v. Waddy,* No. 05AP-866, 2006 WL 1530117, at *11 (Ohio Ct. App. June 6, 2006) ("We do not hold that all who assert a claim pursuant to *Atkins* and *Lott* necessarily will warrant a hearing and expert assistance simply by raising the issue."); *Sasser v. Norris*, 553 F.3d 1121, 1126 (8th Cir. 2009) (evidentiary hearings on *Atkins* claims "not mandate[d] . . . in every conceivable set of circumstances"); *In re Holladay*, 331 F.3d 1169, 1173 n.1 (11th Cir. 2003) ("Were it otherwise [than being required to make a sufficient showing to warrant a second or successive petition], then literally any prisoner under a death sentence could bring an *Atkins* claim in a second or successive petition regardless of his or her intelligence.  No rational argument can possibly be made that this result is appropriate . . . ."); *State v. Williams*, 831 So.2d 835, 858 n.33 (La. 2002) ("There is no automatic right to a hearing on the issue of mental retardation, whether the hearing is sought pre-trial, while the case is on appeal, or as post-conviction relief.").  *See also Bedford v. Bobby*, – F.3d –, 2011 WL 1882447, at * 7 (6th Cir. 2011) (court properly based its threshold determination that a competency hearing was not required on "paper review" of expert reports).

[11]  Dr. Rheinscheld opined that the WAIS III is the "gold standard" test to assess intelligence, but that it should not have been administered to Frazier twice within a twelve-month period to avoid "practice effects."  Nevertheless, he states that Frazier achieved similar scores both times, indicating the scores' reliability.  (App. to Return of Writ vol. 5, 104-05.)  There also

42

Frazier argues that the standard error of measurement ("SEM"), or the difference between an observed score and an error-free score, should be taken into account.  The SEM for the WAIS III test is plus or minus five points, adjusting Frazier's full-scale IQ scores to a range of 67-77 and 70-80, falling under the 70 mark.  (ECF No. 24, 25.)  The Sixth Circuit has rejected this argument, however.  It stated in *In re Bowling*, "there is no indication that the psychologists who administered the IQ tests to Bowling would not have already considered the adequacy and accuracy of the testing mechanisms in calculating his scores or in using these instruments for evaluation in the first place."  *In re Bowling*, 422 F.3d at 437 (citing *United States v. Roane*, 378 F.3d 382, 409 (4th Cir. 2004), and quoting that court's observation that the psychologist's care in calculating an IQ score "belies the suggestion that [the psychologist's] analysis did not account for possible variations in his testing instrument"); *Murphy v. Ohio*, 551 F.3d 485, 509 (6th Cir. 2009) ("[T]here was no indication that the other evaluations had not already considered the impact that an out-of-date test or some other measurement of error could have on Murphy's full-scale IQ.").        Thus, Frazier has not met the first prong of the *Lott* test, and is presumed not mentally retarded unless he can successfully rebut that presumption.

### ii.    significant limitations in two or more adaptive skills

Frazier contends that he meets the second prong of the *Lott* test because he is significantly

---

is confusion in the record concerning an early IQ score of Frazier's.  Respondent contends that Dr. Smalldon incorrectly attributed to Frazier an early IQ score of 63 that really belonged to Frazier's brother John.  (ECF No. 25, 4-5.)  Dr. Smalldon agreed with the prosecution on cross-examination that he mistakenly believed John's score to be Frazier's.  (Trial Tr. vol. 10, 1986-87, 2032.)  The school records show, however, that Frazier *and* his brother *both* had IQ scores of 63.  Frazier's high school record indicates that he had an IQ of 63 (App. to Return of Writ vol. 9, 35), and a school report prepared for the juvenile court stated that Frazier's brother John also had an IQ of 63.  (*Id.* at 57.)

limited in adaptive skills related to functional academics and work, relying primarily on Dr. Rheinscheld's opinion.  (ECF No. 24, 26.)  Dr. Smalldon, on the other hand, concluded that Frazier does not have significant limitations in adaptive skills.[12]  (Trial Tr. vol. 10, 2042-44.)  As explained above, *Lott* instructs courts to rely upon experts in determining a petitioner's mental status.  *Lott*, 97 Ohio St. 3d at 306, 779 N.E.2d at 1015.  *See also State v. White*, 118 Ohio St. 3d 12, 24, 885 N.E.2d 905, 915 (Ohio 2008) ("While the trial court is the trier of fact, it may not disregard credible and uncontradicted expert testimony in favor of either the perceptions of lay witnesses or of the court's own expectations of how a mentally retarded person would behave."). On balance, this Court finds the opinion of Dr. Smalldon, who was hired by the defense to evaluate Frazier before the trial, more persuasive than that of Dr. Rheinscheld.

Dr. Smalldon is highly qualified and experienced in the field of psychology.  He specializes in forensic psychology and neuropsychological assessment, and has provided expert testimony in nearly 200 capital cases in the past 13 years.  (Trial Tr. vol. 10, 2014-16, 2021.)  In addition, although his testimony was presented at trial for purposes of mitigation rather than establishing an *Atkins* defense, he initially evaluated Frazier to support an *Atkins* motion and carefully considered the standard set forth in *Lott*.  (Trial Tr. vol. 3, 34-35.)  *Cf. State v. Waddy*, No. 05AP-866, 2006 WL 1530117, at *10 (Ohio App. June 6, 2006) (ordering *Atkins* hearing where "[t]he record is unclear concerning the standards Dr. Smalldon employed in his evaluation . . . .  Dr. Smalldon did not have the benefit of the guidelines set forth in *Lott* . . . .").  Moreover,

---

[12]  Dr. Forgac did not offer an opinion on this particular criteria.  He stated, "In an evaluation such as this it is virtually impossible to assess this individual's functioning in these other contexts."  He did note, however, that Frazier had a "neat and clean" appearance, was "well-groomed, appropriate and cooperative," and "was able to function relatively independently."  (App. to Return of Writ vol. 9, 27.)

although Dr. Rheinscheld's expertise in mental retardation would be helpful in a case such as this, the weight of his opinion is undermined by the fact that he did not personally evaluate or test Frazier, but based his conclusions upon Dr. Smalldon's report and testimony and other information defense counsel provided to him.  He offered only a differing opinion.  *See Bedford*, 2011 WL 1882447, at * 7 ("That different doctors reach different conclusions about an individual's mental health does not itself prove that *any one* of the doctors has shown a cognizable basis for granting a *Ford* hearing."); *Murphy*, 551 F.3d at 500 (6th Cir. 2009) (discounting affidavit filed with habeas action to support *Atkins* claim because it "adds nothing more than evidence previously offered at trial").

Frazier has not shown by a preponderance of the evidence that he has significant limitations in two or more adaptive skills.  As to Frazier's academic limitations, what little information that exists about Frazier's schooling is unclear.  Dr. Rheinscheld pointed to Frazier's low test scores, inability to spell and read simple words, and difficulty in computing simple math problems.  He also noted that Frazier was in special education classes, earned two C's, 21 D's, and one F in highschool, quit school in the tenth grade at age 19, and never obtained a GED.  (App. to Return of Writ vol. 5, 104; App. to Return of Writ vol. 9, 34-35.)  Dr. Smalldon further noted that Frazier failed the first grade and was labeled a "slow learner" in school.[13]  (Trial Tr. vol. 10, 2040.)  A school principle wrote when Frazier was in the fourth grade that his scholastic achievement was "not too bad, but is a B.A. pupil.  Is working to his capacity."  A reasonable

_____

[13]  Dr. Smalldon also noted that Frazier's "educational records" identified him as "retarded."  (App. to Return of Writ vol. 9, 8.)  It appears, however, that this "retarded" reference was taken out of context from a statement in a juvenile court record, which reported, "Boy failed the 1st grade and is at the present, retarded one year, being in the 7th grade at Gunckel School."  (*Id*. at 8.)

interpretation of this comment is that "B.A." is an abbreviation for "below average."

This evidence reflects Frazier's certain intellectual deficits and academic struggles, but it does not demonstrate sufficiently significant limitations in academic functioning to indicate mental retardation. Common sense dictates that students who are labeled "below average" and "slow learners," earn poor grades, have weak spelling and math skills, and qualify for some type of "special education," are not necessarily mentally retarded. And the fact that Frazier did not graduate or get a GED could just as easily have been the result of his own choices as a lack of ability.

With regard to Frazier's adaptive skills at work, Dr. Rheinscheld points to the Social Security Administration's ("SSA") diagnosis of Frazier as mentally retarded as the basis for its award of disability benefits. (App. to Return of Writ vol. 5, 105.) Courts have held, however, that SSA diagnoses do not prove mental retardation for purposes of *Atkins* determinations. *See, e.g., Waddy*, 2006 WL 1530117, at *10; *West v. Comm'r Social Sec. Admin.*, 240 Fed. Appx. 692, 697-98 (6th Cir. 2007).

Moreover, as with Frazier's school records, his SSA records are not clear. The SSA reported in a letter dated May 25, 2004, that Frazier had received disability based on a diagnosis of mental retardation, but that his  medical file had been destroyed. The letter also lists his employment history since 1978, which was erratic with long periods of unemployment, from 1979-1994, 1997-1998, and 2000-2003. (App. to Return of Writ vol. 9, 38.) The SSA's stated diagnosis, however, is not supported by the other SSA records Frazier submitted at trial. Those records show that Frazier first applied for SSA disability benefits in 1992, alleging hypertension, ulcers, and anxiety. A hearing was held on June 21, 1993, at which Frazier appeared and testified

46

before an administrative law judge.  The judge denied the claim, writing that although Frazier was

"experiencing some functional limitation attributable to his anxiety-related disorder," his

limitations in areas of daily living, social functioning and concentration were "[s]light," and in the

area of work, "[n]ever."  (*Id*. at 105.)  Frazier applied to the county for disability benefits for the

same alleged conditions in 1994, but again was denied.  Frazier appealed that decision, and again

was denied.  (*Id*. at 81-84, 97, 109.)  The physician who completed a county "Mental Functional

Capacity Assessment"of Frazier indicated that he was "[n]ot [s]ignificantly [l]imited" in every

area he evaluated, including his ability to remember locations and work-like procedures, to

understand and remember detailed instructions, to carry out detailed instructions, to make simple

work-related decisions, and to sustain an ordinary routine without special supervision.  (*Id*. at 82.)

SSA did finally award him benefits in 1994, but the only diagnosis on the form attached to the

SSA Notice of Award was anxiety.  (*Id*. at 95.)  On the SSA evaluation form under the category

"Mental Retardation and Autism" the evaluator checked "[n]o evidence of a sign or symptom

CLUSTER or SYNDROME . . . ."  (*Id*. at 94.)  Dr. Smalldon testified on cross-examination that

the diagnosis stated in the 2004 SSA letter may have been a mistake.  (Trial Tr. vol. 10, 2109-10.)

Frazier himself told Dr. Smalldon that the basis for his disability benefits was his ulcers, high

blood pressure and gastrointestinal problems.  (App. to Return of Writ vol. 9, 5.)  Frazier also told

him, "I've lost jobs 'cause I'd get in trouble.  I'd drink."  (*Id*. at 8.)

     In fact, the record shows that not one of the numerous health and social services

professionals who examined and evaluated Frazier found him to be mentally retarded or even

expressed a concern about his cognitive abilities.  For instance, during a nine-day hospital stay in

1995, after Frazier's brother brought him to the emergency room because he had suicidal and

homicidal thoughts, notes from a "mental status examination" remarked that his "[h]ygiene and grooming were good;" that his "[o]rientation was times three" with "sufficient" concentration and "intact" memory; and that his "[t]hought and speech were appropriate," though "[i]nsight was poor and judgement [sic] was poor."  (*Id*. at 145-46.)  A mental health professional observed during subsequent outpatient treatment, "No evidence of cognitive symptoms."  (*Id*. at 246.)  Another noted in a "termination record" that Frazier did not have a "MI/MR dual diagnosis" and was not "[s]everely mentally disabled" or "[d]evelopmentally disbaled [sic]."  (*Id*. at 232.)

Thus, Frazier's evidence of adaptive limitations is unclear and insufficient to rebut the presumption that he is not mentally retarded.  *See Murphy*, 551 F.3d at 509 (due to the "lack of clarity as to possible deficits," petitioner's evidence was insufficient to overcome presumption that he was not mentally retarded since his IQ scores were above 70).  Moreover, it is likely that the other psychological disorders Dr. Smalldon diagnosed Frazier as possessing–namely, depressive disorder, alcohol and drug abuse, and personality disorder with antisocial, passive-aggressive and narcissistic features–contributed to whatever limitations Frazier does experience. (App. to Return of Writ vol. 9, 13.)  *See In re Bowling*, 422 F.3d at 438 ("While some of the problems may also be indicative of a low level of intellectual function, their existence has little tendency to establish mental retardation, given Bowling's other diagnoses and the fact that the psychological evidence is inconsistent with mental retardation.").

### iii.     onset before age 18

Frazier presented no evidence of the date of onset of mental retardation other than the inference that since IQ scores generally remain stable after eight years of age, he must have had his low IQ in childhood, which also is supported by his school records.  (App. to Return of Writ

vol. 5, 105.)   Thus, Frazier has not satisfied this last criteria either.

Accordingly, this Court agrees with Dr. Smalldon that while Frazier's intellectual deficits are  "striking," and it is evident that he has severe psychological problems, these conditions do not amount to "mental retardation" within the meaning of *Atkins* and *Lott*.  Frazier's IQ scores create a presumption that he is outside the range of mental retardation, and he has not met his burden of showing by a preponderance of the evidence that his limitations in adaptive skills overcome that presumption.  The first claim for relief must fail.

## 2.    Ineffective Assistance of Counsel

Frazier's second claim for relief is that his trial counsel "failed to ensure that a complete mental retardation evaluation was conducted of Frazier to adequately prepare and present his mental retardation claim at trial."  (ECF No. 13-1, 21.)  Specifically, Frazier asserts that defense counsel retained an expert, Dr. Smalldon, who did not have the necessary expertise in mental retardation, did not address the issue of the IQ tests' standard error of measurement, was unaware of the *Lott* criteria, and did not properly assess Frazier's adaptive skills.  (*Id*. at 22-23.)  He also claims that counsel themselves did not know the definition of mental retardation set forth in *Atkins* and *Lott*, and failed to reasonably investigate the issue of mental retardation.  (*Id*. at 23.)

The Ohio Supreme Court overruled this claim on its merits on Frazier's direct appeal.  It found that, in addition to other grounds not asserted in this action, counsel was not ineffective for withdrawing Frazier's *Atkins* claim because Dr. Smalldon testified that Frazier's IQ score of 72 is a "pretty accurate" score.  *Frazier*, 115 Ohio St. 3d at 163, 873 N.E.2d at 1292.  The court further found that counsel was not ineffective for failing to obtain an opinion from a mental retardation expert before withdrawing the *Atkins* claim, because Drs. Smalldon and Forgac were both "fully

49

qualified" and Dr. Smalldon, in particular, "has presented testimony about mental retardation in numerous capital cases." *Id.*

The state post-conviction courts held that this claim was barred by *res judicata* because the Ohio Supreme Court considered and rejected it, and Dr. Rheinscheld's affidavit was insufficient evidence *dehors* the record to defeat the bar. *Frazier*, 2008 WL 4408645, at *11.  The Ohio Court of Appeals for the Sixth District further agreed with the Ohio Supreme Court on the merits that Dr. Smalldon is a recognized expert in the field and relying on his opinion does not constitute ineffective assistance "merely because an expert exists who has a contrary opinion." *Id.*  This Court agrees and finds no merit in this claim.

Because the Ohio Supreme Court considered this claim on its merits, this Court must decide whether its decision was contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1); *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003) (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of Section 2254(d)(1) applies).  The Supreme Court recently observed that the standards imposed by *Strickland v. Washington*, 466 U.S. 668 (1984), and Section 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so."  *Harrington*, 131 S. Ct. at 788.  Therefore, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*

To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the *Strickland* two-prong test.  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the

50

Sixth Amendment." *Id* at 687. To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation falls "below an objective standard of reasonableness." *Id.* at 688. A court considering an ineffective assistance claim "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, – U.S. –, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689).

The petitioner also must demonstrate that he or she was prejudiced by counsel's errors. To do this, a petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Harrington,* 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting *Strickland*, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

A reviewing court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. *Strickland*, 466 U.S. at 689. "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 131 S. Ct. at 788 (quoting

*Strickland*, 466 U.S. at 690).  If a petitioner fails to prove either deficiency or prejudice, then the ineffective assistance of counsel claims must fail.  *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).

The Ohio Supreme Court's conclusion that Frazier's trial counsel was not ineffective for withdrawing his *Atkins* claim or for not retaining a mental retardation expert is a reasonable application of *Strickland's* standard.  Frazier's counsel provided adequate representation in his reliance upon Dr. Smalldon.  As has been noted, Dr. Smalldon had ample qualification and experience.  *See Murphy*, 551 F.3d at 501 (defense counsel's alleged failure to retain expert on mental retardation was not ineffective).

Furthermore, the record demonstrates that counsel and Dr. Smalldon were well aware of the criteria imposed by *Lott* in determining mental retardation.  Dr. Smalldon referred to the *Lott* test in his testimony.  (Trial Tr. vol. 10, 2041-44.)  Counsel informed the trial court, "In fact, he would be well above the level of rebuttal presumption based upon his functional adaptation and all of the other factors that are listed in the Atkins case.  And we went through with each doctor each and every [sic] of those factors, and their testimony would not be supportive."  (Trial Tr. vol. 3, 34-35.)  Finally, contrary to Frazier's assertion, Dr. Smalldon did testify about the standard error of measurement and opined that the IQ scores were "pretty accurate numbers."  (Trial Tr. vol. 10, 2040, 2044.)  Thus, this Court finds Frazier's *Atkins*-related claim of ineffective assistance of counsel is without merit.[14]

### B.    *Third Claim for Relief: Batson Challenge*

---

[14]  The Court's finding also renders meritless an assertion of ineffective assistance of counsel as cause for the procedural default of Frazier's *Atkins* claim.

Frazier's third ground for relief is based on *Batson v. Kentucky*, 476 U.S. 79 (1986), which forbids prosecutors from using race as the basis for excusing potential jurors from serving on a jury.  Frazier asserts that the State violated the *Batson* holding during his trial when it exercised peremptory challenges to excuse two African-American members of the panel.  (ECF No. 13-1, 24.)  Frazier raised this issue on direct appeal to the Ohio Supreme Court, and it is therefore preserved and ripe for federal habeas review.

There were no African Americans on Frazier's jury.  Of 86 people randomly selected for the jury pool, only six were African Americans.  The final jury pool of 44 prospective jurors had only had three African Americans.  The prosecution then exercised peremptory challenges against two of those individuals, Annie Franklin and Freddie Robinson.  The prosecution made a total of five peremptory challenges in all.  The record is unclear as to what happened to the third African-American juror.  *Frazier*, 115 Ohio St. 3d at 149, 873 N.E.2d at 1280.

Frazier's counsel objected to the State's use of its peremptory challenges as a violation of *Batson*.  (Trial Tr. vol.5, 1021, 1067-68.)  With regard to Ms. Franklin, defense counsel explained,

> The Court may have noticed that there are very, very few African Americans in the jury pool to begin with.  In fact, the entire second batch of jurors contained none.  She was the only African American seated.  She's been excused.  I think that leaves us with two or three in the entire jury pool.

(*Id*. at 1021.)  The prosecutor then proffered his reason for the challenge:

> [W]e excused her because she said on record during our one-on-one conference that she was morally opposed to the death penalty . . . .  She did not rise to the level of cause but she was one of the people that was close to being cause, and we ask that she be excused.

*Id*.  The trial court responded, "Well, that is on the record. . . .  And she is excused."  (*Id*. at 1021-22.)

The State provided two reasons for its peremptory challenge of Mr. Robinson.  The prosecutor explained to the trial court,

> One is a factual issue.  We'll have testimony from a number of witnesses that the defendant was smoking crack cocaine on the night before the murder occurred.  And this defendant [sic; venire member] is a recovering drug addict.
>
> Our main concern, however, in moving for a challenge on him on a peremptory basis was based on his answers during the Witherspoon portion of the questioning where he was unable to articulate whether or not he could actually impose capital punishment.  He simply could not answer that question.  He had to think about it, and he was the only potential juror who could not tell us one way or the other whether or not he could do it.

(*Id*. at 1067-68.)  The trial court replied, "All right. . . .  The Batson challenge is on the record.  And we'll call the next juror.  Thank you."  (*Id*. at 1068.)

After jury selection was completed, the trial court elaborated on its ruling.  It stated,

> [T]here were two Batson challenges yesterday. . . .  One of the things I wanted to put on the record was that I did a review of the questionnaires that the entire venire answered, the 86 people that we actually talked to.  And out of the 86, six people were African American.
>
> Now, some of those people . . . were released after our individual voir dire because of challenges or other complications.  And I think that the final pool, we only had three in the final 44 that were African American.

(Trial Tr. vol. 6, 1121.)  Frazier's counsel then stated his concern:

> Judge, my concern is not only that the two African Americans that we had as potential jurors in the first 12 were excused, but there seems to be a real paucity of African Americans in the entire jury pool anyway. . . .  I'm rather mystified as to why there are so few African Americans, because in every jury trial I've had there have been at least a dozen out of a pool of 80.

(*Id*. at 1122-23.)  The court replied that the prospective jurors were randomly selected from the voter registration list, and the small number of African-Americans in this jury pool was "just one of those things that happened. . . .  I think we tried to be as random as possible even in mixing the

54

. . . final jurors in our random selection."  (*Id*. at 1123-24.)

In *Batson*, the Supreme Court held that the Equal Protection Clause precludes a party from using a peremptory challenge to exclude members of the jury venire on account of their race. *Batson*, 476 U.S. at 89.  When a criminal defendant wishes to raise a *Batson* objection to a prosecutor's peremptory challenge, the trial court must utilize a three-step inquiry.  First, the court must determine whether the defendant has made a prima facie case showing that the prosecutor exercised a peremptory challenge on the basis of race.  *Batson*, 476 U.S. at 96-97.  Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question.  *Id*. at 97-98.  "Although the prosecutor must present a comprehensible reason, '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible'; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)). Indeed, as the Sixth Circuit has noted, "'[t]he fact that a prosecutor's reasons may be founded on nothing more than a trial lawyer's instincts about a prospective juror does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions.'"  *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (quoting *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989)).

Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  *Batson*, 476 U.S. at 98.  "This final step involves evaluating 'the persuasiveness of the justification' proffered by the prosecutor, but 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.'" *Rice*, 546 U.S. at 338 (quoting *Purkett*, 514 U.S. at 768).  As the Sixth Circuit has

55

explained, "'In making this determination, the court presumes that the facially valid reasons proffered by the [party exercising the peremptory] are true.'" *Braxton*, 561 F.3d at 459 (quoting *Lancaster v. Adams*, 324 F.3d 423, 433 (6th Cir. 2003)).  The issue, therefore, "'comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.'"  *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)).  "'Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'"  *Id.*  "'Great deference' to a trial court's findings on the issue of discriminatory intent 'makes particular sense' because

> [t]here will seldom be much evidence bearing on that issue, and the best evidence
> often will be the demeanor of the attorney who exercises the challenge.  As with
> the state of mind of a juror, evaluation of the prosecutor's state of mind based on
> demeanor and credibility lies 'peculiarly within a trial judge's province.'

*Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991)).  "Thus, '*in the absence of exceptional circumstances*, we would defer to state-court factual findings.'" *Id.* (quoting *Hernandez*, 500 U.S. at 366 (emphasis added)).

Frazier claims that he has made a prima facie case of discrimination in that of the three African Americans who remained in the final jury pool, the prosecutors used peremptory challenges to excuse two of them.  He further argues that the prosecutor's proffered reasons for the challenges were pretextual.  Finally, he contends that the trial court erred when it made no findings to support its ruling.  (ECF No. 13-1, 24-25.)

The Ohio Supreme Court addressed each of these arguments on direct review, and rejected all of them.  Thus, this Court must determine whether the Ohio Supreme Court's decision was contrary to, or an unreasonable application of, *Batson* under AEPDA Section 2254(d)(1).  This

56

Court also must determine if the Ohio Supreme Court made an unreasonable factual determination when it accepted the trial court's finding that the prosecutor's reasons for excluding the jurors at issue were credible pursuant to Section 2254(d)(2).  Frazier can obtain habeas relief only if the Ohio Supreme Court "was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge," because "[s]tate-court factual findings . . . are presumed to be correct."  *Rice*, 546 U.S. at 338-39 (citing 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)); *see also Braxton*, 561 F.3d at 458.

First, the Court finds that the Ohio Supreme Court reasonably applied *Batson* when it accepted the trial court's cursory ruling.  It held that although "more thorough findings . . . would have been helpful," the trial court did not commit error in its ruling on the *Batson* challenges because it "clearly rejected them."  The court correctly stated that a "trial court is not compelled to make detailed factual findings to comply with *Batson*."  *Frazier*, 115 Ohio St. 3d at 152, 873 N.E.2d at 1283 (citing *Miller-El*, 537 U.S. at 322 ("a state court need not make detailed findings addressing all the evidence before it" to render a proper *Batson* ruling)).  *See also Purkett*, 514 U.S. at 766, 769-70 ("holding that a federal court failed to adequately defer to the state trial court's factual finding of no racial motive, even though the trial court rejected the *Batson* objection "without explanation"); and *Braxton*, 561 F.3d at 462 (holding that "[i]n the absence of clearly established Supreme Court authority requiring further elaboration," trial court, "albeit in abbreviated fashion, adequately and reasonably conveyed its decision" permitting challenged exclusion).

In addition, this Court finds that the Ohio Supreme Court's determination that the trial court correctly accepted the prosecutor's reasons for excluding the jurors as race-neutral also was

reasonable. The court provided a lengthy factual analysis following the framework outlined in the Supreme Court decision *Miller-El v. Dretke*, 545 U.S. 231 (2005). In that case, the Supreme Court examined five factors that indicated that a prosecution's reasons for challenging African-American jurors were a pretext: (1) "bare statistics"; (2) similarity in answers to voir dire questions by the African-American jurors who were peremptorily challenged and by non-African-American prospective jurors who were allowed to serve; (3) broader patterns of practice, including jury shuffling; (4) disparate questioning of African-American and non-African-American jurors; and (5) evidence of historical discrimination against African Americans in jury selection. *Frazier*, 115 Ohio St. at 148, 873 N.E.2d at 1280 (citing *Miller-El*, 545 U.S. at 240-253, 255-60, 263-64 (which held that the totality of the evidence showed that prosecutor's race-neutral reasons for peremptory challenges of two African-American potential jurors were pretext for discrimination)). The Ohio Supreme Court first excluded the third and fifth factors, since the State did not engage in jury shuffling and there is no evidence of historical discrimination in the Lucas County prosecutor's office. *Id.* It next concluded, agreeing with the trial court, that the "bare statistics" did not show discriminatory intent. *Id.* at 149. It found that the lack of African Americans on Frazier's jury resulted from the few African Americans randomly selected for the original jury pool, which accounted for six out of 86 prospective jurors. *Id.* The court also found no evidence of disparate questioning of the jury venire by the prosecution. *Id.*

As to the final factor, the Ohio Supreme Court rejected Frazier's claim that the non-African-American jurors gave similar answers to voir dire questions about the death penalty as potential jurors Franklin and Robinson, but were not challenged. It noted the Supreme Court's holding in *Miller-El* that "[i]f a prosecutor's proffered reason for striking a black panelist applies

58

just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step."  *Id.* (quoting *Miller-El*, 545 U.S. at 260).  The Ohio Supreme Court therefore compared the voir dire answers of Ms. Franklin and Mr. Robinson with those who served on the jury, and found that the record did not support Frazier's pretext claim as to either of them.  *Id.* at 149-51, 873 N.E.2d at 1281-82.

The Ohio Supreme Court also correctly and reasonably rejected Frazier's claim that the prosecutor's failure to challenge Mr. Robinson for cause because he was a recovering drug addict shows that the State's use of his drug addiction as a reason for its peremptory challenge was pretextual on the ground that a prosecutor's reason for a peremptory challenge "need not rise to the level justifying exercise of a challenge for cause."  *Id.* at 152, 873 N.E.2d at 1283 (quoting *Batson*, 476 U.S. at 97).

This Court must accord the Ohio Supreme Court "great deference" in its fact-finding, which are  presumed to be correct, and only question them "in exceptional circumstances."  *See Hernandez*, 500 U.S. at 364-65; *Braxton*, 561 F.3d at 459, 462; 28 U.S.C. § 2254(e)(1).  This is not, however, such an exceptional case.  The Ohio Supreme Court reviewed the record and conducted a careful analysis of the voir dire.  The State offered race-neutral explanations for the peremptory challenges to which Frazier objects, and, based on the record, it was reasonable for the Ohio Supreme Court to accept those reasons and reject Frazier's claim that they were pretextual.  *See United States v. Ferguson*, 23 F.3d 135, 141 (6th Cir. 1994) (holding that an inference of intentional discrimination does not arise merely because the prosecution used its strikes to exclude members of a particular racial group, even where it used *all* of its strikes in that fashion); *Wade v. Terhune*, 202 F.3d 1190, 1198 (9th Cir. 2000) ("the fact that the juror was the

one Black member of the venire does not, in itself, raise an inference of discrimination").

Accordingly, Frazier's third claim for relief fails.

### C.    Fourth Claim for Relief:  Failure to Grant *Remmer* Hearing

Frazier's fourth claim for relief is that the trial court erred by failing to conduct a hearing

and dismiss a juror pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), when informed that

the juror had been contacted by a relative of one of the State's witnesses.  Frazier contends that

"[b]y refusing to hold a hearing, the trial court attempted to avoided [sic] a mistrial by disallowing

Frazier the opportunity to prove that his jury had been tainted and could not deliberate fairly."

(ECF No. 13-1, 26.)  Frazier also asserts that the trial court erred when it did not dismiss the juror

at issue, because it is uncertain what other conversations may have occurred between the juror, the

witness's relative and the witness during the trial.  (*Id*. at 27.)  Respondent counters that the trial

court complied with *Remmer* by conducting a hearing on the record and correctly determining that

the juror could remain impartial and participate in the trial.  (ECF No. 19, 28-30.)

On application to the Ohio Supreme Court, Petitioner presented this claim as follows:

> [T]he trial court erred by failing to dismiss juror Kennedy because she had been
> approached by a relative of one of the State's witnesses.  In the alternative, Frazier
> argues that his counsel were ineffective by failing to request that juor Kennedy be
> dismissed from the jury.

*Frazier*, 115 Ohio St. 3d at 152, 873 N.E.2d at 1283.

The Ohio Supreme Court provided the following account of the relevant facts:

> Before guilt-phase opening statements, juror Kennedy notified the bailiff
> that someone had approached her at a softball game and asked whether she was on
> jury duty.  The trial court then conducted an in-chambers hearing to determine
> whether improper contact had occurred.
>
> Juror Kennedy informed the court that on the previous evening, she was
> playing in a softball game for her employer's team.  One of the players, whose

60

name she did not know, approached her and asked, "Are you on jury duty?" Kennedy replied, "Yes, but I'm not allowed to discuss it." He said, "Oh, okay," and "put his hands like he understood and . . . backed away." He said nothing more to Kennedy for the rest of the game. Kennedy later learned that Tim Gangway was the person who approached her and that Gangway's wife and Kennedy worked for the same employer. Tim is the brother of Bill Gangway, the victim's boyfriend.

Kennedy said that she is not close to Tim or his wife. Kennedy stated that she did not feel intimidated, threatened, or uncomfortable because of this conversation. She added that this experience did not compromise her ability to be a fair and impartial juror.

Tim's version of the events echoed Kennedy's. Tim told the court that he had approached Kennedy after his wife told him that one of her co-workers might be on Frazier's jury. Tim talked to Kennedy because he was concerned that she might see the name "Gangway" on the back of his jersey and make some connection with his brother, who was scheduled to testify in the case. Tim said he approached Kennedy, explaining, "I didn't want it to cause any problems in the future." After finishing his explanation, the trial court admonished Tim not to have any kind of contact with the jurors, and he was excused.

The trial court stated that Tim "was trying to do the right thing." The state and trial counsel agreed, both noting, "We're good." The trial court declared the matter resolved, and the trial continued.

*Frazier*, 115 Ohio St. 3d at 152-53, 873 N.E.2d at 1283-84.

### 1.    Procedural Posture

Respondent claims that Frazier's *Remmer* claims are partially unexhausted because Frazier argued on direct appeal only that the trial court abused its discretion when it failed to dismiss juror Kennedy, not when it failed to conduct a hearing about her contact with a witness's relative. (ECF No. 19, 26.)  Respondent further asserts that Frazier's argument in favor of the juror's dismissal is procedurally defaulted because Frazier's counsel did not object to Ms. Kennedy's participation on the jury and the Ohio Supreme Court dismissed this claim based on a state procedural rule.  (*Id*. at 27.)  Frazier contends that his claim regarding the hearing was fairly

61

presented to the state courts and is therefore exhausted.  He does not address the issue of procedural default.  (ECF No. 24, 45-46.)

This Court need not resolve the exhaustion issue, since the AEDPA's Section 2254(b)(2) allows courts to deny unexhausted habeas petitions on the merits.  Frazier's *Remmer* claim is, however,  procedurally defaulted.  Frazier's counsel did not object to Ms. Kennedy's inclusion on the jury, and the Ohio Supreme Court ruled the claim was waived.  *Frazier*, 115 Ohio St. 3d at 153, 873 N.E.2d at 1284.

### 2.    Merits

Even if the Court were to review the merits, it would find that the claim does not warrant habeas relief.  In *Remmer*, the Supreme Court declared that "[t]he integrity of jury proceedings must not be jeopardized by unauthorized invasions."  *Remmer*, 347 U.S. at 451.  The Court noted the general rule that

> [i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.  The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Id*.  Accordingly, the Supreme Court ruled that trial courts, when informed of any improper communication with a juror, "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."  *Id*.

The Ohio Supreme Court found no plain error in the trial court's ruling on this issue.  It concluded that the trial court properly relied upon the juror's testimony regarding her impartiality.

*Frazier*, 115 Ohio St. 3d at 153, 873 N.E.2d at 1284 (citing *State v. Herring*, 94 Ohio St. 3d 246, 259, 762 N.E.2d 940 (Ohio 2002)).  It further found Frazier's concern about additional contact between juror Kennedy, Bill Gangway, Tim Gangway or Tim's wife "totally speculative" and unsupported by the record.  *Id*.

This Court similarly finds Frazier's *Remmer* claims meritless.  First, although Frazier's claim that the trial court erred by failing to conduct a hearing was not considered by a state court, and therefore is not subject to habeas review, this Court finds it groundless.  The trial court did, in fact, conduct a hearing--on the record and with both parties and their counsel present--regarding Ms. Kennedy's conversation with Tim Gangway.  The prosecutor and defense counsel had an opportunity to voice their concerns to the court and question Ms. Kennedy and Mr. Gangway.  The court also questioned Ms. Kennedy and Mr. Gangway.  (Trial Tr. vol. 6, 1124-45.)  After this hearing, the prosecutor and defense counsel agreed with the court that there was no problem with Ms. Kennedy serving on the jury.  (*Id*. at 1145.)

As to Frazier's remaining *Remmer* claim regarding Ms. Kennedy's dismissal, which the Ohio Supreme Court did consider,  this Court finds that the courts' rulings are not contrary to, nor an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).  The trial court properly relied on Ms. Kennedy's assurances that she was not influenced in any manner by her conversation with Mr. Gangway, and the Ohio Supreme Court reasonably upheld that ruling.

Thus, Frazier's fifth claim for relief is meritless.

### D.     *Fifth and Sixth Claims for Relief: Ineffective Assistance of Trial Counsel*

Frazier's fifth and sixth grounds for relief state various instances in which his trial counsel violated his Sixth Amendment right to effective assistance of counsel.  These claims are:

63

1.      withdrawing a motion to disqualify Frazier as death ineligible due to mental retardation;

2.      failing to request an expert in the field of mental retardation;

3.      failing to suppress certain oral statements Frazier made to police officers and evidence obtained pursuant to search warrants executed by police;

4.      failing to request a hearing about, and moving for the dismissal of, a juror who had been improperly contacted;

5.      failing to object to the opinion testimony of a forensic scientist from the Ohio Bureau of Criminal Investigation;

6.      failing to properly investigate, prepare, and present mitigating evidence;

7.      arguing incorrect legal standards and making prejudicial statements to the jury during the penalty phase of the case;

8.      failing to object to certain statements of the prosecutor;

9.      resting his case without ensuring that Frazier had properly waived his right to testify;

10.     failing to object to or request a hearing regarding the trial court's improper discussion with a juror;

11.     ensuring that Frazier understood his right to allocution; and

12.     failing to move for a change of venue.

(ECF No. 13-1, 30-41.)

### 1.      Procedural Posture

Frazier raised subclaims 1, 2, 3, 5, 8, 12 and aspects of subclaims 4, 6 and 7 on direct appeal.  (ECF No. 13-1, Apx. B.)  The Ohio Supreme Court rejected the claims on their merits. *Frazier*, 115 Ohio St. 3d at 154-57, 171-75, 873 N.E.2d at 1284-86, 1298-302.  Frazier raised subclaim 6 on post-conviction appeal.  (ECF No. 13-1, Apx. C.)  The post-conviction courts

rejected this claim on the ground of *res judicata*, and it is therefore procedurally defaulted. *Frazier*, 2008 WL 4408645, at *11.

Respondent states that subclaims 4 and 7 (partially), and 9, 10 and 11 of the claims listed above are unexhausted and therefore procedurally defaulted.  (ECF No. 19, 14, 31-32.) Respondent also states that the remaining parts of subclaims 4 and 7, and subclaim 5 are procedurally defaulted.  According to Respondent, then, this leaves only subclaims 1, 2, 3, 8 and 12 preserved for habeas review.  Frazier responds that he filed a *Murnahan* appeal, excusing the exhaustion requirement under the "futility doctrine" and establishing cause and prejudice for the defaulted subclaims.  (ECF No. 24, 68.)

This Court will not engage in this analysis, however, because it finds the ineffective assistance of counsel claims that Respondent challenges as unexhausted and/or procedurally defaulted are meritless.  *See* 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

### 2.      Merits

As noted above, *supra* Section VII.A.4.b, to demonstrate ineffective assistance of counsel, Frazier must establish that his trial counsel was deficient and that this deficiency prejudiced him. *Strickland*, 466 U.S. at 687.  Prejudice is shown if Frazier establishes "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  For those claims that were raised to state courts and decided on the merits, this Court must decide whether its decision was contrary to, or an unreasonable application

of, clearly established federal law.  28 U.S.C. § 2254(d)(1); *Mitchell v. Mason*, 325 F.3d 732,

737-38 (6th Cir. 2003) (holding ineffective assistance of counsel is mixed question of law and fact

to which the unreasonable application prong of Section 2254(d)(1) applies).  For those that were

not, the claims are reviewed *de novo*.  *See, e.g., Murphy v. Ohio*, 551 F.3d 485, 498-99 (6th Cir.

2008); *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007).[15]

> **a.      withdrawing a motion to disqualify Frazier as death ineligible
> due to mental retardation and failing to request an expert in the
> field of mental retardation**

These subclaims restate Frazier's second claim for relief, which this Court has already

addressed and rejected, *see supra* Section VII.A.4.

> **b.      failing to suppress certain oral statements Frazier made
> to police officers and evidence obtained pursuant to
> search warrants executed by police**

Frazier contends that his trial counsel were ineffective for failing to file motions to

suppress various oral statements given to police officers and evidence police seized pursuant to

search warrants during their investigation.  He claims that he did not knowingly and intelligently

waive his Fifth and Sixth Amendment rights to silence under *Miranda v. Arizona*, 384 U.S. 436

(1966), and that "the same considerations apply to the search warrant as to the statements."  These

statements and this evidence, he contends, "comprised a significant portion of the prosecution's

case."  (ECF No. 13-1, 30-31.)

Detective William Seymour testified at Frazier's trial that Frazier was advised of his

---

[15]  Frazier contends that as a mixed question of law and fact, this Court must review his
ineffective-assistance claims *de novo*.  (ECF No. 24, 59.)  This is incorrect.  The case he cites as
support for that proposition, *Rickman v. Bell*, 131 F.3d 1150, 1153 (6th Cir. 1997), merely states
the general rule that circuit courts, not district courts, review these habeas claims *de novo*.

*Miranda* rights before making a statement.  Frazier waived his *Miranda* rights orally and in writing and agreed to provide a statement.  The advisement and waiver of *Miranda* rights were videotaped. (Trial Tr. vol. 8, 1764-67; App. to Return of Writ vol. 8, 195.)  Detective Seymour testified that Frazier appeared clearheaded and not under the influence of drugs or alcohol at the time.  (Trial Tr. vol. 8, 1764-65.)

The Ohio Supreme Court addressed these claims on direct appeal and rejected them.  First, the court determined that Frazier's statements were not involuntary because of his low intelligence.  *Frazier*, 115 Ohio St. 3d at 154, 873 N.E.2d at 1285.  It noted that "mental deficiency is but one factor in the totality of circumstances to be considered in determining the voluntariness of a confession."  *Id.*  It quoted the Supreme Court's ruling that "[a] defendant's mental condition may be a significant factor in the 'voluntariness' calculus. . . .  But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'"  *Id*. (quoting *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)) (internal quotation marks omitted).  The Ohio Supreme Court then noted that Frazier did not present any evidence of police coercion or overreaching upon which his counsel would have had grounds to request suppression of Frazier's statement.  Second, the court found no evidence that Frazier was incapable of making a voluntary statement since Frazier was found competent to stand trial and later found not mentally retarded.  *Id*.  Third, the court noted that Frazier's behavior during the police interview undermined his claim that his statements were involuntary because of his low intelligence, because they demonstrated that "Frazier comprehended the investigators' questions, and he was able to express his thoughts and recall his actions in a rational manner."  *Id.* at 155.  Finally, the

court concluded that trial counsel appeared to have made a tactical decision not to challenge

Frazier's statement because the introduction of Frazier's statement allowed the jury to hear his

proclamations of innocence and his exculpatory explanation of events without the risk of having

him take the stand in his own defense and subject himself to cross-examination. *Id*. at 155, 873

N.E.2d at 1286.

The Ohio Supreme Court also rejected Frazier's claim that counsel were ineffective for

failing to suppress evidence police seized pursuant to a search warrant, because of Frazier's

mental deficiencies. It stated, "Nothing in the record suggests that the search warrant was

defective, and Frazier presents no evidence that his mental deficiencies had any bearing on the

issuance of the search warrant." *Id*. at 156.

Since the Ohio Supreme Court ruled on the merits of this claim, this Court must review its

decision under 28 U.S.C. § 2254(d)(1) to determine if it was a reasonable application of

*Strickland*.

Any suspect of a crime is guaranteed under the Constitution the rights to assistance of

counsel and to remain silent during in-custody police interrogation, and any statement obtained in

derogation of those rights is inadmissible in a subsequent criminal prosecution. *Miranda*, 384

U.S. 436. The suspect may waive these rights provided the waiver is knowingly and intelligently

made. *Johnson v. Zerbst*, 304 U.S. 458 (1938). However, as the Supreme Court cautioned in

*Miranda*,

> If the interrogation continues without the presence of an attorney and a statement is
> taken, a heavy burden rests on the government to demonstrate that the defendant
> knowingly and intelligently waived his privilege against self-incrimination and his
> right to appointed counsel. . . . This Court has always set high standards of proof
> for the waiver of constitutional rights.

*Miranda*, 384 U.S. at 475.  In determining if a waiver has been knowingly and intelligently made, the Court has explained:

> The inquiry has two distinct dimensions. . . .  First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Frazier cites several cases in which courts have concluded that defendants with serious intellectual limitations did not knowingly and intelligently waive their *Miranda* rights.[16]  (ECF No. 24, 66-67.)  But these cases–most of which are not habeas actions, and none of which involve ineffective assistance claims–do not support the conclusion that the Ohio Supreme Court's consideration of Frazier's ineffective assistance claim on this ground was an unreasonable application of *Strickland*.  Indeed, the Ohio Supreme Court's decision on this issue was manifestly reasonable.  As to Frazier's statements at issue, the court examined the testimony of the detective present when Frazier signed the waiver and  reviewed the videotape of that interview.  It found no evidence of police coercion or apparent mental difficulties on Frazier's part.  It also cited the results of psychological tests determining that Frazier was competent to stand trial and not

---

[16]  They include:  *United States v. Garibay*, 143 F.3d 534, 538-39 (9th Cir. 1998); *Cooper v. Griffin*, 455 F.2d 1142, 1144-46 (5th Cir. 1972); *United States v. Aikens*, 13 F. Supp. 2d 28. 34 (D.D.C. 1998); *State v. Caldwell*, 611 So.2d 1149, 1152 (Ala. Crim. App. 1992); *People v. Bernasco*, 138 Ill.2d, 562 N.E.2d 958, 963-66 (Ill. 1990); *State v. Rossiter*, 88 Ohio App. 3d 162, 623 N.E.2d 645 (Ohio Ct. App. 1993).

mentally retarded.  Finally, it set forth a plausible trial strategy in allowing the statements to be introduced at trial.  The court also reasonably found no evidence to suggest that the search warrant was defective and trial counsel ineffective for failing to suppress it.

Frazier's ineffective assistance claim on this ground, therefore, is meritless.

### c.    failing to request a hearing about, and moving for the dismissal of, a juror who had been improperly contacted

As this Court found no merit in Frazier's underlying *Remmer* claim, *see supra* Section VII.C.2, Frazier cannot show prejudice, and his claim of ineffective assistance of trial counsel based on this ground must fail.  Moreover, the Ohio Supreme Court reasonably rejected Frazier's *Remmer*-related ineffective assistance claim based on its conclusion that nothing was said to the juror during the conversation at issue that would support a defense challenge.  *Frazier*, 115 Ohio St. 3d at 153-54, 873 N.E.2d at 1284.

### d.    failing to object to the opinion testimony of a forensic scientist from the Ohio Bureau of Criminal Investigation

Frazier complains that his trial counsel were ineffective for failing to object to the testimony of Brian Bowen, a forensic scientist from the Ohio Bureau of Criminal Investigation, who provided opinions about DNA evidence without the proper qualifications.  (ECF No. 13-1, 32.)   The Ohio Supreme Court addressed this issue and held that Frazier's counsel were not deficient by failing to object.  It first found that Bowen was qualified to testify as an expert in DNA analysis.  It further concluded that counsel's actions may have been based on a tactical decision to avoid inviting the prosecutor to ask Bowen questions that might bolster his qualifications in the eyes of the jury.  *Id.* at 157, 873 N.E.2d at 1287.  The Ohio Supreme Court's ruling on this ground of  Frazier's ineffective-assistance claim, again, was a reasonable

application of *Strickland*.

> ### e.  failing to properly investigate, prepare, and present mitigating evidence

Frazier argues that his counsel provided ineffective assistance during the mitigation phase of the trial by failing to retain a substance abuse expert to present testimony about his history of alcohol and drugs, particularly crack cocaine, and by failing to present testimony from his family members.  (ECF No. 13-1, 33-36.)

The Ohio Supreme Court rejected his claim concerning the substance abuse expert.  It ruled that Dr. Smalldon's testimony in the mitigation phase of the trial as well as his written evaluation of Frazier, which was introduced as evidence, "fulfill[ed] the same functions as the expert assistance sought." *Id.* at 174, 873 N.E.2d at 1301 (quoting *State v. Foust*, 105 Ohio St. 3d 137, 823 N.E.2d 836 (2004)).  It noted that Dr. Smalldon testified that he had diagnosed Frazier with a history of alcohol and polysubstance abuse, based upon evidence that he drank 15 to 20 beers a day in his mid-thirties and went through a detoxification program in the mid-1990s.  *Id.*

The court of appeals on post-conviction agreed with the Ohio Supreme Court that Frazier's trial counsel was not ineffective for failing to obtain a substance abuse expert.  It also noted that Dr. Smalldon testified about the extent and effects of Frazier's substance abuse.  And it ruled that the claim was barred by *res judicata* because the expert affidavit Frazier submitted to support his claim did not constitute "new, competent, relevant evidence outside the record that could not, or should not, have been raised at trial."  Therefore, it held, trial counsel's decision to present alternative testimony through Dr. Smalldon about Frazier's substance abuse problem did not constitute ineffective assistance of counsel.  *Frazier*, 2008 WL 4408645, at *12.

Frazier also argues that counsel was ineffective for failing to present testimony of Frazier's

71

family members during the mitigation phase. The court of appeals on post-conviction similarly rejected Frazier's argument. Frazier claims that the jury should have had an opportunity to hear testimony from his brothers, John and Nathaniel, and his sister, Jean, who would have demonstrated that he had family support and "would have humanized him to the jury." (ECF No. 13-1, 34.) The court found that Dr. Smalldon had testified about the quality of Frazier's relationships with his siblings, and that the affidavits of his two brothers and sister "added little to Smalldon's account." Moreover, it found the affidavits described relationships that were "somewhat distant," and did not "overcome the presumption that the decision not to ask the siblings to testify at the mitigation hearing was anything other than a tactical trial strategy." *Id.*

The state courts' rejection of these claims was a reasonable application of *Strickland*. "Counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. However, "[w]here counsel investigates and interviews promising witnesses, and determines that they would not be valuable witnesses, and determines that they would not be valuable in securing defendant's release, counsel's action is mere trial strategy, and it is unreviewable in habeas corpus." *Jalowiec v. Bradshaw*, No. 1:03 CV 0645, 2008 WL 312655, at *81 (N.D. Ohio Jan. 31, 2008) (citing *United States ex rel. Cosey v. Wolff*, 727 F.2d 656, 658 n.3 (7th Cir. 1984), *overruled on other grounds, United States v. Payne*, 741 F.2d 887 (7th Cir. 1984)). Moreover, it is well-settled that alcoholism and other addictions are given little weight in the sentencing phase. *See, e.g., State v. Slagle*, 65 Ohio St. 3d 597, 614, 605 N.E.2d 916 (Ohio 1992).

Accordingly, these claims must fail.

      **f.**     **arguing incorrect legal standards and making prejudicial statements to the jury**

**during the penalty phase of the case**

Frazier complains that various comments his trial counsel made to the jury during the penalty phase of his trial constituted ineffective assistance of counsel.  (ECF No. 13-1, 37-39.) The Ohio Supreme Court addressed some of these claims on direct appeal, including:

1.  This is a horrible crime.  I mean, I heard the evidence too.  It's a horrible crime.  By all accounts, this was a wonderful person.  And she had no reason to die, and she was murdered in a fashion most foul, if you will.  (Trial Tr. vol. 9, 1840.)

2.  In this case, we have an absolutely innocent, absolutely defenseless victim who had hands laid upon her in order to take her life.  (Trial Tr. vol. 10, 2002.)

3.  And again, I'd like to harken back to the statements I made at the conclusion of the first phase and that is, we worked real hard to get a jury in this case, one whose verdict we could trust, and that's what we got.  That's exactly what we got.  And I heard the evidence too.  I mean, I worked on the case for 14 months.  And we got a sound verdict.  (*Id.* at 2008.)

4.  But relative to the nature and circumstances of the offense, yeah, this was a gruesome crime.  They don't get much more gruesome than that.  When you physically lay your hands on another human being in the act of strangulation, take their life, that puts you right up to the top, a consideration for imposition of the death penalty.  (*Id.* at 2163-64.)

The court ruled that in each case, trial counsel used descriptive language regarding the nature of the crime to build rapport with the jury, acknowledge their verdict, and attempt to persuade them of the mitigating factors, a legitimate tactical decision and not ineffective assistance of counsel.  *Frazier*, 115 Ohio St. 3d at 172-73, 873 N.E.2d at 1299-1300.  This is a reasonable application of *Strickland*, and the claim lacks merit.  *See Hicks v. Collins*, 384 F.3d 204, 216 (6th Cir. 2004), *cert. denied*, 544 U.S. 1037 (2005) ("The wisdom of using such adjectives [as 'dastardly' and 'heinous'] is certainly subject to challenge in hindsight, but it is precisely this sort of hindsight-driven judgment that *Strickland* forbids.").

73

The remaining comments of which Frazier complains were not raised on appeal to the state

courts.  They are:

5.      It will make you slaughter your friend in order to get five or ten bucks,
        which is astounding, but that's what it does.  (Trial Tr. vol. 10, 2167.)

6.      As I indicated earlier, I know I'm bumped up right against it here with an
        absolutely defenseless, innocent victim.  I'm bumped up right against the
        ultimate issue.  (*Id*. at 2006.)

7.      There's a weighing test.  What we have to do is to decide whether or not the
        information and facts that we present outweigh the value that you put on
        things that the State has introduced.  (*Id*.)

The first two comments are similar to the comments reviewed above.  They are merely the

trial counsel's attempt to establish rapport with the jury and explain the mitigating factors.  The

last comment also is not prejudicial.  Frazier argues that this comment misstates the law,

suggesting the burden is on the defendant to produce mitigating evidence that outweighs the

State's evidence.  (ECF No. 13-1, 37.)  This Court disagrees.  This is most likely an unintentional

error and "'the kind of mistake[] which can occur in the heat of battle [that does] not amount to

objectively unreasonable conduct."  *United States v. Johnson-Wilder*, 29 F.3d 1100, 1105 (7th Cir.

1994).

### g.      failing to object to certain statements of the prosecutor

This Court will address and reject the underlying claim presented by this subclaim below,

*see infra* Section VII.E.2.  Frazier therefore cannot show prejudice, and his claim of ineffective

assistance of trial counsel based on this ground must fail.

### h.      resting his case without ensuring that Frazier had properly waived his right to speak

Frazier claims that his trial counsel were ineffective for failing to ensure that Frazier had

74

knowingly and intelligently waived his right to make a sworn or unsworn statement in the penalty phase of the trial.  He states that there is no evidence in the record that counsel properly explained to him his right to make the statement or ensure that the trial court did so.  (ECF No. 13-1, 40.) This claim was not adjudicated on the merits by state courts, so this Court reviews it *de novo*.

As discussed below with regard to Frazier's underlying claim that he was denied his right to testify, *infra* Section VII.F.2, criminal defendants have a constitutional right to testify, and that right only can be waived by the defendant.  *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987).  The Sixth Circuit has ruled, however, that a waiver of that right "is presumed from the defendant's failure to testify or notify the trial court of the desire to do so."  *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000).  Thus, a trial court has no duty to address a silent defendant or ensure that a waiver is made on the record.  Similarly, when a tactical decision is made not to have a defendant testify, it is presumed that his counsel has fulfilled his or her duty to inform the client of his rights and advise him on whether or not to take the stand.  *Id*.  The Sixth Circuit has explained,

> A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. . . .  At base, a defendant must 'alert the trial court' that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. . . . When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct.

*Id*. (citations omitted).

Here, there is no evidence on the record that Frazier's failure to assert his right to testify was attributable to inadequate representation.  As discussed below, Frazier was silent when his counsel informed both the trial court and the prosecutor that Frazier would not testify, and there is nothing on the record to indicate he disagreed with his counsel about testifying.  Frazier also does

not contend that he wanted to testify and was dissuaded by his attorney, or that he would testify if granted a new trial. He also has not alleged prejudice as a consequence of his decision not to testify on his own behalf. This claim is meritless.

> ### i. failing to object to or request a hearing regarding the trial court's improper discussion with a juror

Frazier complains that his trial counsel were ineffective when they did not object to or request a hearing to address the trial court's improper communication with a juror. (ECF No. 13-1, 40.) After the verdict was read and the court excused the jury from duty, a juror said, "Thank you, Your Honor." The judge replied, "I'll come back and talk with you for a couple of minutes." (Trial Tr. vol. 10, 2220.) Frazier argues that this "procedure" was improper because the court spoke to a juror before it had accepted its recommended sentence. (ECF No. 13-1, 40.)

This claim is meritless. There is no record that any "procedure" ever took place, much less what it entailed. Nor does Frazier cite any evidence or authority to support his contention that the alleged conversation was improper or that Frazier's counsel's had a duty to object to it.

> ### j. ensuring that Frazier understood his right to allocution

Frazier claims that his trial counsel were ineffective because they did not "ensure that he understood his right [to allocution] and the ability to present additional mitigation for the consideration for the actual sentencer." (ECF No. 13-1, 40.) As discussed below, *infra* Section VII.G.2, there is no cognizable claim in habeas based on a defendant's right to allocution. The Sixth Circuit has ruled, however, that although there is no constitutional right to allocution, an ineffective-assistance claim can arise in a habeas action based on appellate counsel's failure to raise the state law claim that the trial court did not address the defendant's right to allocution,

which is reversible error.  *Goff v. Bagley*, 601 F.3d 445, 464-66 (6th Cir. 2010).

This case presents a different claim than *Goff*.  Here, the issue is not the trial court's failure to address the defendant's right to allocution and counsel's duty to object to that error.  The trial court did, in fact, ask Frazier and his counsel whether either of them "would like to make a sentencing statement."  Frazier's counsel replied that they would not.  Frazier said nothing.  (Trial Tr. vol. 11, 2221.)  Rather, the issue Frazier presents is whether trial counsel was deficient in their duty to adequately inform Frazier of his right.  This claim is meritless.

There is nothing in the record to suggest that Frazier's counsel did not explain to Frazier his right to make a statement and advise him regarding that decision.  Nor does Frazier suggest that he wanted to make a statement but his counsel persuaded him not to.  This Court must presume that counsel "rendered adequate assistance" in carrying out the general duty "to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."  *Strickland*, 466 U.S. at 688-90.

### k.        failing to move for a change of venue

Frazier argues that trial counsel was ineffective by failing to move for a change of venue when they were aware of the extent of pretrial publicity.  (ECF No. 13-1, 40-41.)  The Ohio Supreme Court determined on direct appeal that counsel may have reasonably made a strategic decision to conduct the trial in Toledo instead of requesting a change of venue, and, moreover, the trial court was able to minimize any threat of an impartial jury through careful voir dire.  *Frazier*, 115 Ohio St. 3d at 174, 873 N.E.2d at 1301.  This, too, was a reasonable application of *Strickland*.

Accordingly, Frazier cannot show that his trial counsel were constitutionally ineffective on

any of the grounds presented, and his fifth and sixth claims for relief must fail.

**E.      *Seventh Claim for Relief: Prosecutorial Misconduct***

Frazier argues that he was denied his constitutional rights as a result of prosecutorial misconduct.  He complains of two comments the prosecutor made during his trial.  Frazier claims the prosecutor made one of the comments during his penalty phase summation to mislead the jury by inviting it to consider aspects of the nature and circumstances of the case as an aggravating factor.  (ECF No. 13-1, 42-43.)  The prosecutor stated:

> Let's look at the other nature and circumstances of this offense.  Let's talk about the victim for a second.  He chose somebody who was more helpless than him. Sure he didn't bring the knife with him, but he brought his hands on her neck until she was this close to being dead and then he cut her throat.  This is predatory behavior.  That fits in with the lack of remorse, the failure to take responsibility for what he did, the efforts to throw off the police and all the lies he's told about this case.  There's very little weight, due to the nature and circumstances of the offense, that go on the mitigation side of the scale.

(Trial Tr. vol. 10, 2188-89.)  Frazier also complains that the prosecutor unfairly stated to the jury:

> If you all go back there and just vote your individual opinions, we haven't accomplished anything through the course of this trial.

(Trial Tr. vol. 10, 2194.)  He claims that this statement is "in direct contravention of established case law, both Ohio and federal," because it urges a unanimous decision.  (ECF No. 13-1, 43.)

**1.      Procedural Posture**

Respondent contends that this claim is procedurally defaulted.  (ECF No. 19, 53.)  On direct appeal, the Ohio Supreme Court noted that Frazier's trial counsel never objected to either comment, and the claim is waived.  *Frazier*, 115 Ohio St. 3d at 164, 873 N.E.2d at 1293.  Frazier does not offer any cause or prejudice for the default.  This claim is therefore procedurally defaulted.

2.     **Merits**

Even if the Court were to address the merits, it would find that the claim does not warrant habeas relief.  To assert a successful prosecutorial misconduct claim in a habeas proceeding, a prosecutor's conduct must be "so egregious as to render the petitioner's trial fundamentally unfair."  *Buell v. Mitchell*, 274 F.3d 337, 364 (6th Cir. 2001).  It "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *Durr v. Mitchell*, 487 F.3d 423, 439 (6th Cir. 2007).  The Sixth Circuit has stressed the narrow scope of a habeas court's review of this due process claim.  It has stated, "We do not possess supervisory powers over state court trials." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  "[I]t is the responsibility of the [state courts] to police their prosecutors; we have no such authority."  *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979).

Claims of prosecutorial misconduct "must be answered in light of the totality of the circumstances in the case."  *Lundy v. Campbell*, 888 F.2d 467, 473 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990).  The analysis must focus on "'the fairness of the trial, not the culpability of the prosecutor.'"  *Byrd*, 209 F.3d at 529 (quoting *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993)).  The factors to consider are:  the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused.  *Id*. (quoting *Pritchett v.*

79

*Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).  Relief cannot be granted unless "the prosecutor's

statement likely had a bearing on the outcome of the trial in light of the strength of the competent

proof of guilt."  *Id.*  To constitute a denial of due process, the misconduct must be "so pronounced

and persistent that it permeates the entire atmosphere of the trial." *Id.*

Under the AEDPA, this bar is heightened by the deference given to the state courts'

determination of the petitioner's prosecutorial misconduct claims.  As the Sixth Circuit has

explained,

> If this court were hearing the case on direct appeal, we might have concluded that
> the prosecutor's comments violated [the petitioner's] due process rights.  But this
> case is before us on a petition for a writ of habeas corpus.  So the relevant question
> is not whether the state court's decision was wrong, but whether it was an
> unreasonable application of clearly established federal law.

*Macias v. Makowski*, 291 F.3d 447, 453-54 (6th Cir. 2002).

Frazier's claims do not meet this stringent standard.  As to the first comment complained

of, the Ohio Supreme Court, in applying a plain error analysis, found that the prosecutor's

comment during mitigation was proper under Ohio Revised Code Section 2929.04(B).  It stated,

> Although 'prosecutors cannot argue that the nature and circumstances of an offense
> are aggravating circumstances, the facts and circumstances of the offense must be
> examined to determine whether they are mitigating. . . . Thus, a prosecutor may
> legitimately refer to the nature and circumstances of the offense, both to refute any
> suggestion that they are mitigating and to explain why the specified aggravating
> circumstance[s] outweigh mitigating factors.'

*Frazier*, 115 Ohio St. 3d at 165-66, 873 N.E.2d at 1294 (quoting *State v. Sheppard*, 84 Ohio St. 3d

230, 238, 703 N.E.2d 286 (Ohio 1998)).  The court found that the prosecutor did not make the

statement to demonstrate aggravating circumstances, but to show that the nature and

circumstances of the offense were not mitigating.  Frazier's counsel had argued that Frazier

"didn't go down there [i.e., to the victim's room] with his own knife.  He didn't go down there

80

attempting to inflict any harm at all." The prosecutor responded by noting that Frazier did not

bring a knife to the victim's apartment because he strangled her.  *Id*. at 166.  The court's

interpretation of the prosecutor's remarks is not contrary to, nor an unreasonable application of,

federal law.

The same is true of the second comment at issue.  The Ohio Supreme Court observed,

"'While the prosecutor's comments were not precise, isolated comments by a prosecutor are not to

be taken out of context and given their most damaging meaning.'" *Id*. (quoting *Donnelly v.

DeChristoforo*, 416 U.S. 637, 647 (1974)).  It concluded, "This argument was not improper

because the prosecutor was simply urging the jurors to deliberate before voting."  *Id*. at 166, 873

N.E.2d at 1295.  The court also reasoned that the trial court accurately instructed the jurors on

both the weighing process and that unanimity is required for a death penalty sentence.  *Id*.

Thus, Frazier's seventh claim for relief is meritless.

### F.    Eighth Claim for Relief:  Waiver of Right to Testify

In Frazier's eighth claim for relief, he asserts that the trial court violated his constitutional

rights by failing to advise him of his right to testify and to provide an unsworn statement in the

penalty phase of the trial and by failing to obtain a waiver of those rights on the record.  (ECF No.

13-1, 44.)  During a sidebar discussion, the trial court asked Frazier's counsel whether Frazier

would make a statement to the jury, and the prosecutor asked defense counsel if Frazier was going

to give an unsworn statement.  He answered no to both questions.  (Trial Tr. vol. 10, 1989.)  The

prosecutor requested that the waiver be put on the record, but that was not done.  (*Id*. at 1989,

2147, 2155.)

### 1.    Procedural Posture

Respondent asserts that this claim is unexhausted and procedurally defaulted because Frazier has never presented this issue to a state court.  (ECF No. 19, 58-59.)  Frazier replies that because he filed an application to re-open his direct appeal, the exhaustion requirement is excused under the "futility doctrine."  He also argues that his ineffective assistance of appellate counsel claims demonstrate cause and prejudice for his failure to raise the issue on direct appeal.  (ECF No. 24, 84-87.)  This Court need not resolve these issues, however, as it finds this claim meritless.

### 2.    Merits

The right of a criminal defendant to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant.  *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987).  The defendant retains the ultimate authority to decide whether or not to testify.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

But the United States Supreme Court has never ruled that a trial court must advise a defendant of his right to testify or obtain a waiver of that right on the record.  And the Sixth Circuit Court of Appeals has followed the majority of federal circuit courts in finding that there is no such duty.  It has held, "Barring any statement or actions from the defendant indicating disagreement with counsel or the desire to testify, the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record."  *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000). *See also United States v. Yarbrough*, 1990 WL 17263, at *2 (6th Cir. 1990).[17]

---

[17]  Nor can this Court grant relief, as Frazier suggests, based on the violation of a "liberty interest" established by an Ohio statute allowing capital defendants to provide unsworn statements.  (ECF No. 13-1, 45-46.)

82

Thus, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed, as it is presumed that the defendant's attorney has fulfilled his duty to inform his or her client of his rights. *Webber*, 208 F.3d at 551. "Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so." *Id*.

Here, Frazier was silent when his counsel informed both the trial court and the prosecutor that Frazier would not testify, and there is nothing on the record to indicate he disagreed with his counsel about testifying. Frazier also does not contend that he wanted to testify and was dissuaded by his attorney, or that he would testify if granted a new trial. He also has not alleged prejudice as a consequence of his decision not to testify on his own behalf.

Accordingly, Frazier's eighth claim for relief fails.

### G.      *Ninth Claim for Relief:  Waiver of Allocution*

Frazier claims in his ninth claim for relief that the trial court failed to hold a hearing, require a written waiver, or engage in any colloquy with him to ensure that he understood that he had the right to allocution under Ohio law and that he knowingly, intelligently and voluntarily waived that right. (ECF No. 13-1, 50.) The trial court asked Frazier and his counsel whether either of them "would like to make a sentencing statement." Frazier's counsel replied that they would not. Frazier said nothing. (Trial Tr. vol. 11, 2221.)

### 1.      Procedural Posture

The same arguments are presented by both Respondent and Frazier regarding the procedural posture of this claim as those summarized above regarding the eighth claim for relief. (ECF No. 19, 58-59; ECF No. 24, 84-87.) As with that claim, this Court declines to analyze these

83

issues because it finds the claim lacks merit.

### 2.    Merits

Ohio law provides all criminal defendants with the right to allocution before a sentence is imposed.  Ohio Rule of Criminal Procedure 32(A)(1) states,

> Before imposing sentence the court shall afford counsel an opportunity to speak on behalf of the defendant and also shall address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment.

Ohio R. Crim. P. 32(A)(1).  The Ohio Supreme Court also has held that, pursuant to Rule 32(A)(1), before imposing sentence, a trial court must address the defendant personally and ask whether he or she wishes to make a statement on his or her own behalf or present any information in mitigation of punishment, and the failure to do so is typically reversible error.  *State v. Campbell*, 90 Ohio St. 3d 320, 323, 738 N.E.2d 1178, 1188 (Ohio 2000).

The Sixth Circuit has recognized the right of a defendant to allocute as "of the utmost importance" and  a "fundamental procedural guarantee that places the defendant before the judge at a culminating moment of the criminal judicial process."  *United States v. Garcia-Robles*, 640 F.3d 159, 164, 165 (6th Cir. 2011).  Nevertheless, the right to allocution is not a constitutional right.  The United States Supreme Court has held, "[T]he failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus."  *Hill v. United States*, 368 U.S. 424, 428 (1962).  *See also Goff v. Bagley*, 601 F.3d 445, 464 (6th Cir. 2010) ("'there is no right to allocution under the federal constitution'") (citations omitted).

Moreover, in this case, the trial court did in fact ask Frazier if he wanted to make a statement before the court imposed his sentence.  (Trial Tr. vol. 11, 2221.)  This claim therefore

lacks merit and is denied.

### H.    Tenth Claim for Relief:  Waiver of Defendant's Presence

Frazier, in his tenth claim for relief, complains that the trial court's failure to secure his presence at various in-chambers discussions and legal conferences violated his constitutional right to be present.  (ECF No. 13-1, 53.)  Frazier acknowledges that his counsel waived his presence, but stresses that "[a]t no point did the trial court inquire of Frazier whether he understood his right to be present and/or whether he had provided his counsel to determine whether his presence should be waived."  (*Id.*)  Frazier raised this issue on direct appeal to the Ohio Supreme Court, and it is therefore preserved for federal habeas review.

The constitutional right to presence is rooted in both the Confrontation Clause and the Due Process Clause of the United States Constitution.  *United States v. Gagnon*, 470 U.S. 522, 526 (1985).  The right is not absolute, however.  The Supreme Court has explained,

> [A] defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . .  [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, *and to that extent only*."

*Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934) (emphasis added)).  Thus, "[t]he Constitution only grants to the criminal defendant the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings . . . .'" *United States v. Brown*, 571 F.2d 980, 986 (6th Cir. 1978) (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)).

Moreover, the *Gagnon* Court held that a trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have the right to attend."  *Id.* at 528.  A defendant's failure to assert the right to presence is an adequate waiver.  *Id.*

85

at 528-29. The Court declared, "If a defendant is entitled . . . to attend certain 'stages of the trial'

which do not take place in open court, the defendant or his counsel must assert that right at the

time; they may not claim it for the first time on appeal . . . ." *Id*. at 529. Indeed, contrary to

Frazier's argument that his absence "during these hearings was prejudicial because the decisions

regarding the progression of Mr. Frazier's case were his to make, not his attorneys" (ECF No. 13-

1, 55), the Supreme Court has stressed that clients cannot expect to participate in every aspect of

their case and, aside from instances in which counsel is ineffective, must accept the consequences

of their lawyer's decisions, including the decision to waive a client's constitutional right. It has

stated,

> Although there are basic rights that the attorney cannot waive without the fully
> informed and publicly acknowledged consent of the client, the lawyer has–and
> must have–full authority to manage the conduct of the trial. The adversary process
> could not function effectively if every tactical decision required client approval.

*Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988).[18]  *See also Lowery v. Cardwell*, 575 F.2d 727, 729

(9th Cir. 1978) (in-chambers conference discussing procedural matters did not offend defendant's

due process rights); *United States v. McCoy*, 8 F.3d 495, 497 (7th Cir. 1993) (defendant's "absence

---

[18]  Frazier cites the *Taylor v. Illinois* decision for the proposition that counsel cannot waive the accused's right to presence without a "fully informed and publicly acknowledged consent." (ECF No. 31-1, 55.) The issue the Court addressed in *Taylor*, however, was whether exclusion of testimony of a material defense witness as a discovery sanction against the defendant violated the Compulsory Process Clause. It only mentioned the right to presence in a footnote as an example of a right an attorney cannot waive without the "fully informed and publicly acknowledged consent of the client,"citing a 1963 court of appeals case, *Cross v. United States*, 325 F.2d 629 (D.C. Cir. 1963), for that proposition. *Id.* at 418 n.24. As explained above, however, the Supreme Court has ruled that this right is not absolute, and the *Cross* case, which concerned a defendant who refused to attend part of his trial, appears to have been overruled by *Taylor v. United States*, 414 U.S. 17, 19-20 (1973), which held that a defendant who chose not to attend his trial had waived his right to be present by failing to assert it.

from [nine sidebar] conferences did not detract from his defense or in any way affect the fundamental fairness of his trial").

Whether a defendant has been improperly excluded from a trial proceeding must be considered in light of the whole record.  *Snyder*, 291 U.S. at 115.   In *Gagnon*, the Supreme Court found that the defendants' due process rights were not violated when they were excluded from an *in camera* conference between the judge, defense counsel, and a juror regarding the juror's possible bias.  The Court based its holding on the fact that the defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending." *Gagnon*, 470 U.S. at 527.

Pursuant to the AEDPA's Section 2254(d)(1), this Court must determine whether the Ohio Supreme Court's ruling regarding Frazier's absence from the court proceedings was contrary to, or an unreasonable application of, established federal law.  Set forth below is a description of each instance Frazier complains of and the Ohio Supreme Court's ruling on it.

### 1.    in-chambers discussions held on March 16, 2004, January 26, 2005, and March 17, 2005

Frazier first complains about his absence from three in-chambers discussions between the court, defense counsel, and the State on March 16, 2004,[19] January 26, 2005, and March 17, 2005. (ECF No. 13-1, 53.)  The March 2004 discussion dealt with scheduling an appointment for a mental competency evaluation (Trial Tr. vol. 2, 1-3); at the January 2005 pretrial, the court referred to an in-chambers discussion concerning pretrial and trial dates (*id*. at 2); and at the

---

[19]  There is no transcript of a hearing held on March 16, 2004, in the record.  The Court assumes the correct date is March 25, 2004, although there was no mention of an in-chambers discussion during that pretrial. (Trial Tr. vol. 2, 1-3.)

March 2005 pretrial, the court mentioned an in-chambers discussion regarding whether and when to argue and rule upon pretrial motions (*id*. at 3).  At a pretrial held on April 27, 2005, the prosecutor brought to the court's attention that counsel did not waive Frazier's presence at the in-chambers discussion at the March 17th pretrial.  Frazier's counsel responded, "We will retroactively waive his presence for the conference we had in the Court's Chambers."  The court then clarified,

> Okay. . . .  [The in-chambers conference] was to discuss the scheduling of the hearing on what we suspected would be the motion, because it had not yet been filed and we wanted to get a date for that and also to determine when the motion would be filed, and I think we also then discussed State wishing to have an expert examine the defendant.  That was the nature of the in-Chambers conference.

(*Id*. at 31-32.)  Both counsel for the defense and the State agreed with the court's description of the discussion.  Frazier was present during this discussion of his waiver and did not object. (*Id*.)

The Ohio Supreme Court rejected this claim on the ground that the record does not affirmatively establish Frazier's absence at the March 2004 and January 2005 discussions.  In addition, regarding the March 2005 discussion, it opined that "Frazier suffered no prejudice, because his absence occurred during a discussion involving legal or scheduling issues within the professional competence of counsel."  *Frazier*, 115 Ohio St. 3d at 159, 873 N.E.2d at 1289.

### 2.      pretrial hearing on May 5, 2005

Frazier complains that he should have been present at a pretrial hearing on May 5, 2005,[20] at which the State and defense counsel discussed a plea resolution and waiver of a jury.  (ECF No. 13-1, 53.)  The Ohio Supreme Court ruled that Frazier's presence at this discussion was properly

---

[20]  There is no transcript of a hearing held on May 5, 2005, in the record.  The Court assumes the correct date is May 3, 2005.  (Trial Tr. vol. 2.)

waived because he was in open court and did not object when defense counsel waived his presence at the in-chambers conference.  *Frazier*, 115 Ohio St. 3d at 159-60, 873 N.E.2d at 1289. (Trial Tr. vol. 2, 15.)

### 3.    in-chambers hearing on April 27, 2005

Frazier also asserts that his absence from an in-chambers discussion on April 27, 2005, violated his right to be present.  (ECF No. 13-1, 53.)  The Ohio Supreme Court dismissed this complaint because the record shows that Frazier was present at these proceedings.  *Frazier*, 115 Ohio St. 3d at 159, 873 N.E.2d at 1289.

### 4.    pretrial hearing on May 11, 2005

Frazier also objects to his absence during an in-chambers conference on May 11, 2005, at which counsel for the defense and State discussed jury selection and excuses and what Frazier would wear at the trial.  (Trial Tr. vol. 5, 927-45.)  The Ohio Supreme Court found that the record does not show that Frazier's presence at the conference was waived, but that his absence "was not prejudicial because the jury received neither testimony nor evidence, and no critical stage of the trial was involved."  *Frazier*, 115 Ohio St. 3d at 160, 873 N.E.2d at 1289.

### 5.    off-the-record bench conferences

Frazier complains of two sidebar conferences conducted off the record at which he was not present.  (ECF No. 13-1, 53; Trial Tr. vol. 8, 1643, 1723.)  The Ohio Supreme Court found that "no prejudice occurred because of the absence of evidence about the discussions during those bench conferences."  *Frazier*, 115 Ohio St. 3d at 160, 873 N.E.2d at 1290.

### 6.    conference concerning jury instructions

Frazier objects to a conference the court conducted with counsel regarding the jury

instructions at which Frazier was not present and which was not on the record.  (ECF No. 13-1, 53.)  Before this conference, the court asked defense counsel, "So for purposes of reviewing the jury instructions you will waive the defendant's presence; is that correct?"  The defense counsel agreed, and the court noted, "Okay.  It's more procedural area than it is a substantive area.  We're just going to be discussing which instructions we want included and the ones we won't need."  Counsel for both sides then agreed that they also did not need to put the conference on record.  (Trial Tr. vol. 8, 1777-78.)  The Ohio Supreme Court held that Frazier's absence during this conference did not deprive him of a fair trial.  *Frazier*, 115 Ohio St. 3d at 160, 873 N.E.2d at 1290.

### 7.  jury question during  jury deliberations

Frazier complains that he was improperly absent from court when a juror asked a question during deliberations.  The jury asked the court whether a written copy of the coroner's report was submitted into evidence.  Defense counsel waived Frazier's presence because "he was brought over and there was some difficulty in getting him in the mood to get dressed for Court."  (Trial Tr. vol. 9, 1961.)  The Ohio Supreme Court dismissed this claim because Frazier's counsel waived his presence and because Frazier invited the error with his own behavior.  *Frazier*, 115 Ohio St. 3d at 160, 873 N.E.2d at 1290.

The Ohio Supreme Court's rulings on Frazier's right-to-presence claims are neither contrary to, nor an unreasonable application of, federal law.  Frazier's absence from these court proceedings would not have frustrated the fairness of his trial.  The proceedings concerned procedural and legal matters for which "the lawyer has–and must have–full authority." *Taylor*, 484 U.S. at 418.  Frazier would not have been able to contribute to his defense at these times, nor

would he have gained anything had he been present during these discussions.  *See Gagnon*, 470

U.S. at 527.

Frazier also was not prejudiced because his counsel waived his right to be present on his

behalf, or because the trial court did not obtain an express waiver from him on the record.  Neither

Frazier nor his counsel ever objected to the proceedings because of Frazier's absence, and, as

noted above, trial courts are not obligated to get an on-the-record waiver of a defendant's presence

at every trial conference which a defendant may have a right to attend.  *Id.* at 528.

Frazier's tenth claim for relief is without merit.

### I.  Eleventh Claim for Relief:  Ineffective Assistance of Appellate Counsel

Frazier claims in his eleventh ground for relief that his appellate counsel provided

constitutionally ineffective assistance of counsel by failing to raise three issues on appeal.  They

are:

> 1.  A capital defendant's right to testify and/or provide an unsworn statement is
>     absolute.  He may not be deprived of these rights without an in-court hearing
>     ensuring that the defendant is waiving the rights in a knowing, intelligent and
>     voluntary manner.
>
> 2.  A trial court may not deprive a capital defendant of his right to allocution pursuant
>     to Ohio Rule of Criminal Procedure 32(A)(1) without obtaining a knowing,
>     intelligent and voluntary waiver.
>
> 3.  A capital defendant is denied his right to effective assistance of counsel when the
>     actions of counsel or the failure of counsel to act deprive the defendant of his right
>     to a full and fair penalty phase hearing.

(ECF No. 13-1, 57-58.)  Frazier's appellate counsel did raise 24 propositions of law on direct

appeal.  (ECF No. 31-1, Apx. B.)

Frazier also submits that appellate counsel were ineffective for not including in his

ineffective assistance claim that his trial counsel:  failed to request a *Remmer* hearing and the

dismissal of juror Kennedy; made certain improper comments to the jury; failed to ensure proper waiver of his right to testify; and failed to ensure that Frazier understood his right to allocute. (ECF No. 13-1, 58.)

### 1.  Procedural Posture

Respondent states that these claims are procedurally defaulted since Frazier raised these claims in his Application to Re-Open his case, but the Ohio Supreme Court denied them as untimely.  *State v. Frazier*, 126 Ohio St. 3d 1541, 932 N.E.2d 336 (Ohio 2010).  Frazier filed the application on April 14, 2010, more than two years past the January 8, 2008, deadline.  (ECF No. 19, 69.)  Frazier offers no cause and prejudice for the untimely application, and this claim is procedurally defaulted.

### 2.  Merits

Even though this claim is barred, it is also without merit.  The right to appellate counsel is firmly established.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  For claims of ineffective assistance of appellate counsel, the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), apply. *Smith v. Robbins*, 528 U.S. 259, 285 (2002).  The Supreme Court has held that "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Id*. at 288.   The Seventh Circuit explained why in *Gray v. Greer*, 800 F.2d 644 (7th Cir. 1986), which was cited by the Supreme Court in *Robbins* and has been cited by numerous circuit courts, including the Sixth.  The court stated in *Gray*,

> Had appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance.  If an issue which was not raised may have resulted in a reversal of the conviction, or an order for a new trial, the failure was prejudicial. . . .  When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious

> issues on appeal.  Significant issues which could have been raised should then be
> compared to those which were raised.  Generally, only when ignored issues are
> clearly stronger than those presented, will the presumption of effective assistance
> of counsel be overcome.

*Id.* at 646.  The court emphasized that "the right to effective assistance of appellate counsel does

not require an attorney to advance every conceivable argument on appeal which the trial record

supports. . . .  We require only that appellate counsel's choice of issues for appeal not fall below

'an objective standard of reasonableness.'"  *Id.* at 647 (quoting *Strickland*, 466 U.S. at 687).

This Court has rejected the claims underlying each of the claims that Frazier argues

should have been raised on appeal.  (Regarding the right to testify, *see supra* Section VII.F.2;

regarding the right to allocution, *see supra* Section VII.G.2; regarding comments made by the

prosecution and defense counsel during the penalty phase of the trial, *see supra* Sections

VII.D.2.g and h and VII.E.2; regarding ineffective assistance in the penalty phase, *see supra*

Sections VII.D.2.b and e; and regarding the *Remmer* hearing, *see supra* VII.C.2.)  Frazier,

therefore, cannot show that he was prejudiced by his appellate counsel's failure to raise them.

Moreover, Frazier has not demonstrated that the claims he now suggests should have been raised

on appeal are any stronger than the 24 claims that were raised.

Frazier's eleventh claim for relief is meritless.

### J.  Twelfth Claim for Relief:  Method of Execution

In his twelfth claim for relief, Frazier argues that Ohio's lethal injection protocol for

executions violates the Eighth, Ninth and Fourteenth Amendments as a cruel and unusual

punishment and an infringement of due process of law.  (ECF No. 13-1, 60-62.)  Specifically, he

claims that it "has not been proven to be more humane or less painful than electrocution," that it

fails to provide adequately trained staff "to take appropriate steps if . . . the inmate is suffering

excruciating pain or if problems arise," and that it inflicts "tortuous, gratuitous, and inhumane pain, suffering , and anguish" upon the inmate.  (*Id*. at 60.)  Frazier raised this issue on direct appeal to the Ohio Supreme Court, which summarily rejected the claim pursuant to its precedent. *Frazier*, 115 Ohio St. 3d at 176, 873 N.E.2d at 1302.  This claim is preserved for federal habeas review.

The Sixth Circuit recently ruled that an inmate's challenge of Ohio's method of execution was cognizable on habeas review.  *Adams v. Bradshaw,* – F.3d –, 2011 WL 2803408, at *2 (6th Cir. 2011).  Claims such as Frazier's, however, have been addressed–and rejected– by both the United States Supreme Court and the Sixth Circuit Court of Appeals.

The Supreme Court reviewed Kentucky's three-drug lethal injection protocol, which was similar to Ohio's at the time, in *Baze v. Rees*, 553 U.S. 35 (2008).  The *Baze* Court declared that "the Constitution does not demand the avoidance of all risk of pain in carrying out executions" since "[s]ome risk of pain is inherent in any method of execution–no matter how humane–if only from the prospect of error in following the required procedure." *Id*. at 47.  Indeed, the Court noted that it has *never* invalidated a State's method of execution as the infliction of cruel and unusual punishment.  *Id*. at 48.  It did, however, point out its objections in the past to "the deliberate infliction of pain for the sake of pain," such as punishments that "involve torture or a lingering death."  *Id*. at 49.  Thus, the Court held that the Eighth Amendment prohibits executions that are "*sure or very likely* to cause serious illness and needless suffering,"or involve a "demonstrated risk of severe pain," but concluded that Kentucky's lethal injection protocol did not meet that standard.  *Id*. at 50, 61 (citations omitted).

The following year, the Sixth Circuit addressed Ohio's lethal injection protocol in *Cooey*

94

*v. Strickland*, 589 F.3d 210 (6th Cir. 2009).  Ohio had just adopted a single-drug protocol,

ostensibly to provide a more humane alternative to the risk of pain arising from the use of the

three-drug regimen previously used in Ohio and at issue in *Baze*.  *Id.* at 219.  The court addressed

numerous aspects of the new protocol, including several that Frazier challenges, such as "the

undue risk of improper implementation of Ohio's protocol, leading to severe pain," "the

employment of untrained and insufficiently competent medical personnel," and "the lack of

supervision of the execution process by a licensed physician."  *Id.* at 223.  The court held that,

under *Baze,* Ohio's new protocol did not violate the Eighth Amendment.[21]  *Id.* at 233-34.  It stated,

"Permitting constitutional challenges to lethal injection protocols based on speculative injuries

and the possibility of negligent administration is not only unsupported by Supreme Court

precedent but is also beyond the scope of our judicial authority."  *Id.* at 225.  The court further

held that the Ohio statute providing the method of execution, Ohio Revised Code § 2949.22, did

not create a liberty and property interest in a quick and painless execution protected by the Due

Process Clause.  *Id.* at 234.[22]

_____

[21] The *Cooey* Court noted that since *Baze*, every federal court of appeals that has addressed challenges to various states' lethal injection protocols has rejected them.  *Id.* at 221.

[22] The District Court for the Southern District of Ohio recently issued an order in a Section 1983 civil rights action granting four Ohio capital inmates stays of execution until further order of the court.  *Cooey v. Kasich*, 2011 WL 2681193 (S.D. Ohio July 8, 2011).  The court ruled that the plaintiff had demonstrated that he is likely to succeed in establishing that Ohio has an unconstitutional execution policy.  *Id.* at *21.  It concluded, based on evidence adduced at a hearing, that "[t]he controlling set of mandates constituting the written protocol that often shielded Ohio's practices from constitutional infirmity and provided the state with a sword to puncture inmates' claims is thus revealed to be an advisory compilation of guidelines subject to being ignored."  *Id.* at *20.  Specifically, the court found that Ohio was deviating from its execution policy  in four "fundamental" respects, including the control over who participates in an execution, which is similar to one of Frazier's complaints.  *Id.* at *22-26.  For purposes of this Court's habeas review under the AEDPA, however, *Baze v. Rees*, 553 U.S. 35 (2008), and *Cooey*

Thus, the Ohio Supreme Court's rejection of Frazier's lethal injection claim was not contrary to, or an unreasonable application of, federal law, and this ground for relief is meritless.

### K.    Thirteenth Claim for Relief:  Proportionality

In his thirteenth ground for relief, Frazier asserts that the Ohio Supreme Court failed to conduct "a fair proportionality review that extends beyond mere 'lip service,'" in violation of the Eighth Amendment prohibition against cruel and unusual punishment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. (ECF No. 13-1, 66-67.)  Frazier raised this issue on direct appeal to the Ohio Supreme Court, which addressed the claim in its independent sentence evaluation as required by Ohio Rev. Code § 2929.05(A) and found that Frazier's sentence was appropriate and proportionate to death sentences approved for other robbery-murder and burglary-murder cases.  *Frazier*, 115 Ohio St. 3d at 176-79, 873 N.E.2d at 1302-05.  Frazier contends that the court's review was inadequate in that it limited its comparison to other capital cases and did not provide a "meaningful comparison" of the cases it did include in its review.  (ECF No. 13-1, 65-66.)  This claim is preserved for federal habeas review.

As Respondent points out, the United States Constitution does not require proportionality review.  *See, e.g., Pulley v. Harris*, 465 U.S. 37, 50-51 (1984); *Buell v. Mitchell*, 274 F.3d 337, 368 (6th Cir. 2001).  Moreover, the Sixth Circuit has declared:

> Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison.  By limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed.

*v. Strickland*, 589 F.3d 210 (6th Cir. 2009), which follows *Baze*, remain the controlling, "clearly established federal law as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

*Buell*, 274 F.3d at 369.

The Ohio Supreme Court's finding was not contrary to, or an unreasonable application of, federal law, and this claim also fails.

### L.    Fourteenth Claim for Relief:  Cumulative Error

Frazier asserts in his fourteenth claim for relief that the cumulative effect of all the constitutional errors he alleges has violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (ECF No. 13-1, 67.)  He raised this issue on direct appeal to the Ohio Supreme Court, which summarily rejected the claim pursuant to its precedent.  *Frazier*, 115 Ohio St. 3d at 175, 873 N.E.2d at 1302.

Respondent is correct that the United States Supreme Court has not recognized this claim. The Sixth Circuit has ruled that "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."  *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).  Moreover, Frazier has not established that any error occurred in the state courts.

Accordingly, this claim must fail.

### M.    Fifteenth Claim for Relief:  Constitutional Challenge

Frazier's last claim is that Ohio's capital punishment scheme violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution.  Specifically, he claims that Ohio's death penalty statutes are constitutionally deficient in the following ways:

   a.    Prosecutors have unregulated discretion in determining who will be charged with the death penalty.

   b.    The statutory scheme fails to require premeditation or deliberation.

   c.    The statutory scheme fails to establish a standard for determining the existence of mitigating factors.

d.      The statutory scheme fails to establish a standard by which to balance the mitigating factors against the aggravating circumstances.

e.      The statutory scheme permits the trier of fact to consider aggravating circumstances at the trial phase.

f.      The statutory scheme does not give the sentencer the option to impose a life sentence when the sentencer determines that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

g.      The statutory scheme encourages capitally charged individuals to plead guilty. Crim. R. 11(C)(3).

h.      The statutory scheme creates a mandatory death penalty.

i.      The statutory scheme permits the State to argue first and last in mitigation.

j.      The statutory scheme permits the death penalty to be applied in an arbitrary, capricious and discriminatory manner.

k.      The statutory scheme mandates that the findings of an examination pursuant to R.C. § 2929.03(D)(1) must be furnished to the trial court, the trier of fact, and the prosecutor and any information learned about the accused would be used against him at trial.

(ECF No. 13-1, 70.)  Frazier raised this issue on direct appeal to the Ohio Supreme Court, which summarily rejected the claim pursuant to its precedent.  *Frazier*, 115 Ohio St. 3d at 175-76, 873 N.E.2d at 1302.

Each of these arguments has been addressed and rejected by federal courts.  Before reaching the individual claims, however, the Court first notes that the United States Supreme Court broadly reviewed and upheld a death penalty statute much like Ohio's in *Gregg v. Georgia*, 428 U.S. 153, 196-207 (1976).  The Sixth Circuit similarly has reviewed Ohio's death penalty statute and found it constitutional.  *Buell v. Mitchell*, 274 F.3d 337, 367-70 (6th Cir. 2001); *see also Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000).

The Court will address each of Frazier's allegations below and provide a summary

98

explanation of why it is unpersuasive.

### 1.     Prosecutorial Discretion

The Supreme Court condoned prosecutorial discretion in *Gregg*, 428 U.S. at 188.

### 2.     Premeditation Not Required

This argument is groundless, as Ohio Revised Code § 2903.01(E) states that no person can be convicted of aggravated murder unless he or she is "specifically found to have intended to cause the death of another . . . ."  Moreover, the Supreme Court sanctioned the use of a criminal state of mind less culpable than intent, namely, reckless indifference, as an acceptable level of culpability to impose the death penalty.  *See Tison v. Arizona*, 481 U.S. 137, 156 (1986) (affirming death sentence of capital defendant who took part in prison escape but was not present when murder of kidnapped family occurred because he possessed a "reckless disregard for human life").

### 3.     Lack of Standard to Determine Mitigating Factors

The Sixth Circuit upheld Ohio's statutory scheme for weighing aggravating circumstances against mitigating factors in *Buell.  Buell,* 274 F.3d at 368.  The *Buell* Court noted that the Supreme Court has upheld a similar statute, as well as one that did not enunciate specific factors to consider or a specific method of balancing the competing considerations.  *Id*. (citing *Franklin v. Lynaugh*, 487 U.S. 164, 172-73 (1988); and *Zant v. Stephens*, 462 U.S. 862, 875 (1983)).  It held that Ohio's procedure met the Supreme Court's requirement that "the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence." *Buell*, 274 F.3d at 368 (quoting *Sumner v. Shuman*, 483 U.S. 66, 72 (1987)).

### 4.     Lack of Standard to Balance Mitigating Factors Against Aggravating Circumstances

This allegation was addressed in Subsection (3), above.

### 5. Allows Aggravating Circumstances at Trial Phase

In *Lowenfield v. Phelps*, the Supreme Court stated,

> The use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase.

*Lowenfield*, 484 U.S. 231, 244-45 (1988). The Sixth Circuit has ruled that Ohio's capital sentencing scheme is consistent with *Lowenfield*. *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001).

### 6. Precludes Life Sentence Option

The Supreme Court rejected a similar argument in *Blystone v. Pennsylvania*, 494 U.S. 299 (1990). It stated,

> Death is not automatically imposed upon conviction for certain types of murder. It is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances. This is sufficient . . . .

*Id.* at 305.

### 7. Encourages Guilty Pleas

In *United States v. Jackson*, 390 U.S. 570, 582 (1968), the Supreme Court determined that a legislative body cannot produce a chilling effect on a defendant's Fifth Amendment right not to plead guilty and Sixth Amendment right to demand a jury trial. In that case, the Court struck down the capital portions of a federal kidnapping statute because it authorized only the jury to

100

impose the death sentence.  Conversely, in Ohio, "a sentence of death is possible whether a

defendant pleads to the offense or is found guilty after a trial."  *Buell*, 489 N.E.2d at 808.

Consequently, the Ohio scheme comports with constitutional mandates.

### 8.       Creates Mandatory Death Penalty

As stated above, the sentencing authority is constitutionally required to have sufficient

information to enable it to consider the character and individual circumstances of the defendant

before imposing a death sentence.   *Buell*, 274 F.3d at 368 (quoting *Sumner v. Shuman*, 483 U.S.

66, 72 (1987)).  As long as the sentencer also determines that the aggravating circumstances

outweigh the mitigating factors present in the particular crime committed by the particular

defendant, or that there are no mitigating factors, the sentence is constitutional.  *Blystone v.*

*Pennsylvania*, 494 U.S. 299, 305 (1990); *Buell,* 274 F.3d at 368-69.

### 9.       State Argues First and Last in Mitigation

The Supreme Court has stated:

> So long as a State's method of allocating the burdens of proof does not lessen the
> State's burden to prove every element of the offense charged, or in this case to
> prove the existence of aggravating circumstances, a defendant's constitutional
> rights are not violated by placing on him the burden of proving mitigating
> circumstances sufficiently substantial to call for leniency.

*Walton v. Arizona*, 497 U.S. 639, 649-51 (1990), *overruled on other grounds by Ring v. Arizona*,

526 U.S. 584 (2002).  Accordingly, the order of proving mitigation is not unconstitutional as long

as the burden of proof  remains on the prosecutor to prove that the aggravating circumstances

outweigh the mitigating factors.

The Ohio Supreme Court also has long rejected this argument.  It has held, "During the

sentencing phase of a capital trial the state, having the burden of proving that aggravating

circumstances outweigh the mitigating factors, has the right to open and close arguments to the

jury."  *State v. Rogers*, 17 Ohio St. 3d 174, 478 N.E.2d 984, paragraph 6 of the syllabus (Ohio

1985), *granting cert., vacated on other grounds*, 474 U.S. 1002 (1985); *see also State v. Lawson*,

64 Ohio St. 3d 336, 351 n.3, 595 N.E.2d 902, 913 (Ohio 1992).  "While the appellant correctly

recognizes his burden of going forward at the sentencing phase of a capital trial, the burden of

persuasion remains on the state."  *Rogers*, 17 Ohio St. 3d at 183, 478 N.E.2d at 993.

### 10.      Arbitrary, Capricious and Discriminatory

The Supreme Court rejected this argument in *Gregg*, 428 U.S. at 188-95, as it applies to

similar capital sentencing procedures.  The Sixth Circuit has rejected this argument specifically as

it applies to Ohio's death penalty statutory scheme.  *Buell*, 274 F.3d at 367 ("the Ohio death

penalty statute significantly reduces the likelihood of arbitrary and capricious imposition of the

death penalty and does not run afoul of the Constitution"); *Greer v. Mitchell*, 264 F.3d 663, 690

(6th Cir. 2001) (petitioner failed to show a constitutionally significant risk of racial bias affecting

Ohio's death penalty statute); *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000).

### 11.      Production of § 2929.03(D)(1) Examination Findings

Section 2929.03(D)(1) of the Ohio Revised Code requires that reports of pre-sentence

investigations and mental examinations of capital defendants, which are requested by the

defendant, be provided to the court, jury and prosecutor.  The Supreme Court has determined that

this procedure enhances the search for the truth and does not render the proceedings unfair.

*Williams v. Florida*, 399 U.S. 78, 82 (1970).  It has explained:

> A criminal defendant, who neither initiates a psychiatric evaluation nor
> attempts to introduce any psychiatric evidence, may not be compelled to respond to
> a psychiatrist if his statements can be used against him at a capital sentencing
> proceeding.  This statement leads logically to another proposition: if a defendant

> requests such an evaluation or presents psychiatric evidence of such an evaluation, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested.  The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Buchanan v. Kentucky*, 483 U.S. 402 (1987) (citations omitted).

## VIII.  Certificate of Appealability Analysis

This Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Frazier's grounds for relief.  The Sixth Circuit Court of Appeals has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Frazier presented in his Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has make a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole

103

difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000). In that case, the Court held that Section 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Id.* at 483. Thus, the Court determined,

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Id.* at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on the distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in it procedurally ruling." *Id.* (emphasis added).

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for claims for relief 3 (*Batson* claim); 5 and 6 (ineffective assistance of counsel), except subclaims 1 and 2 (*Atkins*-related) and part of 3 (*Miranda* rights) of the fifth claim for relief, as stated below; 8 (right to testify); 9 (right to allocution); 10 (right to presence); and 11 (ineffective assistance of appellate counsel).  No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for claims for relief 4 (*Remmer* claim) and 7 (prosecutorial misconduct), because they are unequivocally procedurally defaulted.

Finally, the Court will not issue a COA for claim for relief 12 (method of execution), 13 (proportionality), 14 (cumulative error), or any of the subclaims of 15 (constitutionality of the death penalty).  These claims occur almost *pro forma* in capital habeas petitions but are routinely rejected.  Reasonable jurists would agree with this finding.

This Court will issue a COA for those claims for relief that relate to Frazier's mental status and his trial counsel's waiver of certain rights related to that mental status, including claim for relief 1 (*Atkins* claim), each subclaim of claim for relief 2 (*Atkins*-related ineffective assistance of counsel), and claim for relief 5, subclaims 1 and 2 (restating *Atkins*-related ineffective assistance claims) and part of 3 (waiver of *Miranda* rights).  Although the Court finds that Frazier's *Atkins* claim is procedurally defaulted, a reasonable jurist could conclude that under these circumstances, and due to the severity of the his sentence, the default may be excused under the actual innocence exception.  In addition, a reasonable jurist could debate this Court's conclusion on the merits of Frazier's *Atkins* and *Atkins*-related ineffective assistance claims, since there was no hearing regarding Frazier's intellectual and functional abilities and much of the evidence adduced in the mitigation phase of the trial on that issue was unclear.  Frazier's ineffective assistance claim

105

regarding the waiver of his *Miranda* rights similarly could be debated by a reasonable jurist, as, again, his intellectual abilities could be viewed as not firmly established.

**IX.     Conclusion**

For the foregoing reasons, the Petition is denied.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to claims for relief 1and 2, and subclaims 1, 2 and 3 (as to *Miranda* rights only) to claim for relief 5, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only.  As to all remaining claims, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

October 24, 2011